STATE NATIONAL BANK OF EVANSTON, Plaintiff and Counterdefendant-Appellant, *v.* NORTHWEST DODGE, INC., Defendant and Counterplaintiff-Appellee.

First District (5th Division)   No. 81—0056

Opinion filed July 30, 1982.

Lawrence Friedman, of Chicago (Linda H. Ktsanes, of counsel), for appellant.

Mitchell, Russell and Kelly, of Chicago (Thomas J. Russell and Cyril J. Watson, of counsel), for appellee.

JUSTICE WILSON delivered the opinion of the court:

This is the second appeal arising out of a contract dispute between State National Bank of Evanston (Bank), and Northwest Dodge, Inc. (Dodge). In the previous appeal we reversed a judgment in favor of the Bank, holding that Dodge was a debtor under section 9—101 of the Uniform Commercial Code (UCC) (as adopted in Ill. Rev. Stat. 1975, ch. 26, par. 9—101 *et seq.*). As such, Dodge was entitled to notice before the Bank sold repossessed motor vehicles that were the subject of retail sales conracts which Dodge had sold to the Bank. (*State National Bank v. Northwest Dodge, Inc.* (1980), 86 Ill. App. 3d 90, 408 N.E.2d 1.) On remand the trial court held that the Bank's failure to notify Dodge before it sold the vehicles barred it from recovering, as a "deficiency," the amounts that it had debited to the dealer's reserve account following the sale of the vehicles. Therefore, the court entered summary judgment in favor of Dodge on its counterclaim for damages, the measure of which was determined to be the total amount that the Bank had debited to the reserve account.[1] For the reasons that follow, we affirm the trial court's judgment.

---

[1] Dodge was awarded $24,148.09 plus interest and costs for a total of $27,983.24, less a set-off amount of $7,157.79 for a final award of $20,825.45. The set-off was for money that the Bank claimed Dodge owed it under a provision of the agreement involving prepayment account refunds.

Dodge, an automobile dealer, sells vehicles to the general public. In 1973 it entered into a "General Dealer Agreement" with the Bank, pursuant to which it sold the Bank retail installment contracts covering its customers' purchase of recreational vehicles. Pursuant to its agreement with Dodge, the Bank purchased the contracts at a discount from their face amounts. Dodge made several warranties pertaining to the contracts and agree that "if any warranty *** is breached or if the Buyer [of the vehicle] successfully asserts against [the Bank] a claim or defense arising out of any of said contracts, or cancels any of said contracts pursuant to law, [Dodge would] repurchase such contracts, on demand, for the unpaid balance due thereon." In Addendum C to the parties' agreement, Dodge was given a 3% participation in the finance income from the installment contracts, 1% of which was to be credited to a dealer's reserve account. Addendum C further provided that the Bank would disburse sums from this fund periodically. Finally, Dodge agreed that the Bank could "charge to the reserve fund, or [Dodge] would pay [Bank] on demand (i) [Dodge's] proportionate share of all refunds allowed on prepayment of accounts, (ii) the balance owing on accounts on which 2 or more installments [were] delinquent, and (iii) the balance owing on accounts which any warranty [was] breached or which [became] uncollectible for any reason."

In February of 1976 the Bank filed a complaint, alleging that Dodge had failed to pay its proportionate share of refunds on prepaid accounts. Dodge counterclaimed, alleging that the Bank "failed to pay Northwest from the Dealer Reserve Account as required by the Agreement" and also claimed that "the Bank charged to the reserve fund of Northwest the balance owing on accounts without a showing that a warranty had been breached or that the accounts had become uncollectible."

The parties stipulated that eight of the recreational vehicles purchased from Dodge had been repossessed by the Bank and then sold by the Bank without prior notice to Dodge. After the sale, the Bank debited the Dealer Reserve Account for amounts representing deficiencies from the sale of the repossessed vehicles and then notified Dodge.

The trial court held that the general dealer agreement between the parties did not create a debtor-creditor relationship as contemplated by section 9—105(1)(d) of the UCC and that consequently Dodge was not entitled to prior notice of the Bank's sale of the repossessed vehicles. The court entered judgment for the Bank on its complaint and also entered judgment against Dodge on its counterclaim.

Dodge appealed from that judgment. We reversed, holding that Dodge was a debtor, entitled to notice under Article 9. We remanded the cause with instructions for the trial court to determine what losses Dodge should recover on its counterclaim. The trial court awarded Dodge a total of $20,825.45 and subsequently denied the Bank's petition for a rehearing. Thereafter, the Bank brought this appeal.

OPINION

In the abstract, the issue presented is whether a secured party's failure to give the debtor notice under section 9—504(3) before selling the repossessed collateral bars the secured party from recovering any deficiency as a matter of law (absolute bar theory). The Bank urges us to adopt the countervailing view that failure to give such presale notice simply creates a rebuttable presumption in favor of the debtor that the value of the collateral is equal to the amount of debt outstanding.[2] Under this theory, to recover a deficiency, the secured party must, in addition to overcoming this presumption, prove that the sale of the collateral was commercially reasonable.

■ Initially we emphasize that the parties' rights and obligations in this case were governed by the terms of their agreement as well as the pertinent provisions of the UCC. The Bank had the contractual right to debit the reserve account or to demand payment from Dodge for the full amount of any balance due on accounts as to which two or more installments were past due or which were uncollectible for any reason. Had it pursued this contractual right of recourse the question of its right to a deficiency after selling the vehicles would not have arisen.[3] By exercising its right to dispose of collateral under section 9—504, however, the Bank was obligated to comply with the notice provision of section 9—504(3)[4] which provides in relevant part:

---

[2]This presumption has the effect of extinguishing the debt.

[3]Moreover, by the Bank's actions Dodge was denied its right to pay off the Bank on accounts in default and to repossess the automobiles itself. It is quite possible that Dodge, as an automobile dealer, could have obtained a higher price for the vehicles than did theBank.

[4]In the previous appeal the Bank argued that it did not send notice to Dodge because it did not realize Dodge was an Article 9 debtor. While this does not excuse the Bank's obligation, it does point up one of the potential problems that may arise when a business contract is not fully analyzed as a secured transaction. For a useful guide to identification and analysis of Article 9 issues see Swygert, *Secured Transactions under Revised Article Nine: Recognition of Legal Issues Through Identification and Phase Analysis,* 22 De Paul L. Rev. 317 (1972).

"[R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made *shall* be sent by the secured party to the debtor ***." (Emphasis added.) Ill. Rev. Stat. 1975, ch. 26, par. 9—504(3).

The Bank concedes that the provision is mandatory in nature but nevertheless challenges the conclusion that compliance with the notice requirement is a condition precedent to recovery of a deficiency. The Bank bases its argument on the theory that since the policy of the UCC is "commercial reasonableness," the secured party should not be deprived of his right to a deficiency without a determination as to whether his failure to comply with the notice provision has damaged the debtor in any way.Citing section 9—504(2) the Bank contends that secured parties have an absolute right to a deficiency because of the language that "unless otherwise agreed, the debtor is liable for a deficiency." (Ill. Rev.Stat. 1975, ch. 26, par. 9—504(2).) Furthermore, the Bank maintains that section 9—507(1) provides Dodge with an adequate remedy because it allows recovery "from the secured party any loss caused by a failure to comply with the provisions of this Part." (Ill. Rev.Stat. 1975, ch. 26, par. 9—507(1); see *Conti Causeway Ford v. Jarossy* (1971), 114 N.J. Super. 382, 276 A.2d 402, *aff'd* (1972), 118 N.J. Super. 521, 288 A.2d 872; *Hodges v. Norton* (1976), 29 N.C. App. 193, 223 S.E.2d 848.) Finally, the Bank argues that the absolute bar approach is punitive and thus runs afoul of section 1—106(1) of the Code, which encourages a liberal construction of remedies to put an aggrieved party in "as good a position as if the other party had fully performed" but to avoid "special" or "penal" damages. For those reasons the Bank requests us to adopt the rebuttable presumption approach, reverse the judgment entered on Dodge's counterclaim, and to remand this case again so that the Bank can produce evidence as to the commercial reasonableness of its sale of the repossessed vehicles. Presumably, if the Bank sustained its burden and overcame the presumption that the value received for the vehicles was equivalent to the amount of debt, it would defeat Dodge's claim for damages, in all or in part. We reject the Bank's arguments.

The decisions from various jurisdictions have shown a distinct lack of uniformity in determining the consequences of a secured party's failure to adequately notify its debtor before selling repossessed collateral. Courts that adhere to the rebuttable presumption rule emphasize the "punitive" nature of the absolute bar approach and apparently believe that allowing a debtor to avoid paying a deficiency if he did not receive notice is a rigid technicality. (See generally *Hall v.*

*Owen County State Bank* (Ind. App. 1977), 370 N.E.2d 918; *Beneficial Finance Co. v. Young* (Okla. 1980), 612 P.2d 1357; *Fedders Corp. v. Taylor* (D. Minn. 1979), 473 F. Supp. 961.) On the other hand, courts which view proper notice as a condition precedent to the secured party's cause of action for a deficiency reason that the debtor's interests cannot be adequately protected if he is denied the opportunity to be present at the sale or to redeem the collateral himself, pursuant to section 9—506. The effect of the rebuttal presumption approach, consequently, is to put the debtor in the difficult position of refuting the secured party's evidence that the sale he did not even attend was commercially reasonable.

The Delaware Supreme Court in a recent opinion analyzed the notice issue in detail and rejected arguments similar to the ones that the Bank sets forth in this case. In *Wilmington Trust Co. v. Conner* (Del. 1980), 415 A.2d 773, 777, the court reviewed the different theories regarding the consequences of a secured party's failure to give proper notice under section 9—504(3) and concluded that the "apparent majority rule under the Code [is] the 'absolute bar' theory." The court reasoned that this approach promotes commercial certainty and cannot be considered punitive because notice is the statutory condition precedent to the attainment of a deficiency judgment. Noncompliance with the statute means that the right to a deficiency does not come into existence; this is not properly viewed as "punishment." The *Wilmington* court further rejected the argument that the debtor's remedy under section 9—507(1) is adequate and should be construed as his exclusive mode of relief from the secured party's noncompliance with the Code, stating:

> "The burdens placed on the creditor under the Code are minimal, while the results of his noncompliance may be very onerous to the debtor. *** We are unable to see any unfairness in protecting the debtor's rights to the exclusion of those of the creditor when the creditor has been placed in such a high degree of control over the relationship and carries such a small burden inorder to gain the advantages of the Statute." (415 A.2d 773, 780.)

See also *Spillers v. First National Bank* (1980), 81 Ill. App. 3d 199, 400 N.E.2d 1057 (debtor's right to damages is cumulative to the barring of a deficiency).

Other courts which have approved the absolute bar approach include *Atlas Thrift Co. v. Horan* (1972), 27 Cal. App. 3d 999, 104 Cal. Rptr. 315; *Stensel v. Stensel* (1978), 63 Ill. App. 3d 639, 380 N.E.2d 526; *DeLay First National Bank v. Jacobson Appliance Co.* (1976),

196 Neb. 398, 243 N.W.2d 745.

In Illinois, the decisions have apparently recognized both the absolute bar and rebuttable presumption approaches. In *Stensel v. Stensel* (1978), 63 Ill. App. 3d 639, 380 N.E.2d 526, the Fourth District Appellate Court held that notice under 9—505(2) is a condition precedent to a secured party's right to a deficiency, emphasizing that the debtor's right to be present at the sale of repossessed collateral is vital to the protection of his interests and that without compliance with the notice provision the secured party would have too free a hand in disposing of the collateral. Accord *Spillers v. First National Bank* (1980), 81 Ill. App. 3d 199, 400 N.E.2d 1057; see also *Morris Plan Co. v. Johnson* (1971), 133 Ill. App. 2d 717, 271 N.E.2d 404.

Other Illinois decisions, however, have implied that the rebuttable presumption approach is the appropriate view. The first case to mention this approach was *Tauber v. Johnson* (1972), 8 Ill. App. 3d 789, 291 N.E.2d 180. In that case a secured party who sold automobiles successfully sued the debtor/buyers for deficiency judgments after reselling the repossessed automobiles. The appellate court reversed the judgment, noting that the secured party had failed to give the debtors adequate notice of the sale. In addition, the plaintiff had induced the debtors to return the automobiles for repairs and then sold them instead. Plaintiff also charged an illegal rate of interest. Finally, the court noted, the plaintiff failed to prove that the sale of the vehicles was commercially reasonable. In light of those facts, the court reversed the plaintiff's deficiency judgment and ordered that judgment be entered for defendants.

The *Tauber* court's reversal of the judgment for plaintiff did not consider or depend on which approach, absolute bar or rebuttable presumption, would be used. Therefore, its comments as to the latter approach are not controlling authority. In discussing the debtor's remedy for a creditor's failure to give notice the court observed that one measure of damages could be the difference between what the repossessed car was actually sold for and the price it would have brought had defendant been notified of the sale. The court went on to note that "[h]ad defendants received notice, they could have purchased the car for the amount still due on the contract and eliminated the deficiency altogether, *as there is a presumption that the secured collateral is worth at least the amount of the debt and the secured party has the burden of proving the amount actually collected was commercially reasonable.* [Citations from other jurisdictions.] If the secured party cannot sustain his burden of proving a commercially reasonable resale he may be denied the amount of the deficiency. [Citations from

other jurisdictions.]" (Emphasis added.) 8 Ill. App. 3d 789, 794.

From the above-quoted passage, other Illinois courts have apparently inferred that Illinois follows the rebuttable presumption approach. (See *Chicago City Bank & Trust Co. v. Wilson* (1980), 86 Ill. App. 3d 452, 407 N.E.2d 964; *Lake Shore National Bank v. McCann* (1979), 78 Ill. App. 3d 580, 396 N.E.2d 1301; *General Foods Corp. v. Hall* (1976), 39 Ill. App. 3d 147, 349 N.E.2d 573; *National Boulevard Bank v. Jackson* (1981), 92 Ill. App. 3d 928, 416 N.E.2d 358.) None of these cases, however, contain a comparative analysis of the two approaches. Moreover, in *McCann* and *Chicago City Bank,* the courts found that adequate notice had been given; therefore, the question of the legal consequences of a secured party's failure to give presale notice was obviated. In *General Foods Corp.* the court framed the issues as (1) which party had the burden of proving that the notice provision had been satisfied and (2) whether the court abused its discretion in granting a judgment in favor of the secured party. The court reversed the judgment and remanded for further proceedings, holding that the secured party had the proof of establishing that proper notice was given and that the record was insufficient to sustain the judgment. Only in *National Bank v. Jackson* did a reviewing court hold that a debtor did not receive proper notice and yet still affirm a judgment for the secured party on the basis of evidence indicating that the sale was commercially reasonable.The *Jackson* opinion does not, however, discuss the absolute bar rule or any of the cases which follow it.

■ After studying the relevant cases and Code provisions we agree with the *Stensel* court that the line of cases which follows the absolute bar theory is the better reasoned and that lack of proper notice "taints" the entire sale. (*Stensel v. Stensel* (1978), 63 Ill. App. 3d 639, 643, 380 N.E.2d 526, 529.) The debtor's right to redeem the collateral or to be present at its disposition is too important to be neutralized by construing the notice requirement as anything less than a condition precedent to the secured party's right to recover a deficiency judgment. The rebuttable presumption approach, in effect, erases the mandatory language of section 9—504(3) and gives the secured party freedom to disregard the notice provision altogether, with relatively little impediment to recovering a deficiency. We conclude, therefore, that when a secured party fails to give reasonable notice before disposing of repossessed collateral, he is barred from recovering any deficiency.

■ The aggrieved debtor can raise lack of notice as a defense to a deficiency suit or in a section 9—507(a) suit against the secured party for damages, which is the situation in the pending case. We find no

error in the trial court's finding that Dodge's losses from the Bank's violation of section 9—504 were equal to the amount that the Bank unilaterally assessed against the reserve fund as its "deficiency" remaining after it sold the repossessed collateral. Accordingly, we affirm the trial court's judgment of $20,825.45 for Dodge.

Affirmed.

LORENZ and MEJDA, JJ., concur.