**COMMERCIAL DISCOUNT CORPORATION, et al., Plaintiffs,**

v.

**William S. KING, et al., Defendants.**

No. 78 C 3442.

United States District Court,
N. D. Illinois, E. D.

Aug. 13, 1982.

See also, D.C., 515 F.Supp. 988.

---

A. Bruce Schimberg, David M. Schiffman, Sidley & Austin, Chicago, Ill., for plaintiffs.

Harry Adelman, Michael Myers, Adelman & Myers, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Commercial Discount Corporation ("CDC") and Leaseamatic, Inc. ("Leaseamatic," a CDC subsidiary) sue defendants William S. King ("King") and Horace Rainey, Jr. ("Rainey") on their joint and several personal guaranty of certain indebtedness of Racran Corporation ("Racran"). Both sides have now moved for summary judgment. For the reasons stated in this memorandum opinion and order defendants' motion is denied and plaintiffs' motion is not ruled on.

This Court's September 23, 1980 opinion ("Opinion I") granted plaintiffs' motion for partial summary judgment on the issue of liability. Thereafter plaintiffs sold much of the collateral covered by the Racran loan agreement but failed to notify King and Rainey of that sale.

Although the King-Rainey guaranty agreement had waived any right to such notice, this Court's May 14, 1981 memorandum opinion and order, 515 F.Supp. 988 (N.D.Ill.1981) ("Opinion II"), held a *post*-default waiver of notice was necessary under Illinois Uniform Commercial Code ("UCC") § 9–504(3).[1] Accordingly Opinion II vacated the summary judgment order solely to determine the effect of plaintiffs' failure to provide notice of the sale of collateral.

■ On that score, in Opinion II this Court held controlling several Illinois cases such as *National Boulevard Bank of Chicago v. Jackson*, 92 Ill.App.3d 928, 48 Ill.Dec. 327, 416 N.E.2d 358 (1st Dist. 1981):

> Failure to provide adequate notice does not, however, absolutely bar a deficiency judgment, but raises a presumption that the value of the secured collateral is equal to the amount of the debt. In order to obtain a deficiency judgment, the creditor has the burden of rebutting the presumption and of proving that the amount collected from the sale was commercially reasonable.

Defendants now argue for an impermissible windfall: They contend that the presumption entitled them to an *outright discharge* if the amount realized from the sale was not "commercially reasonable,"[2] even if it is demonstrated that the collateral's value was not *in fact* equal to the amount of the

---

1. It should be recalled that Opinion I had held defendants also waived the requirement to deal with the collateral in a commercially reasonable manner:

   > King asserts (on information and belief) that plaintiffs failed to deal in a commercially reasonable manner with the collateral in which they were granted a security interest and have failed to comply with obligations to King under Article IX of the UCC... Here too extended provisions of the guaranty (its fourth and fifth paragraphs) provide a complete answer to those arguments as a matter of law.

   *That* pre-default waiver is valid and binding, so proof as to commercial reasonableness of the manner of sale (as distinct from the worth of the collateral) is not required here.

2. It is somewhat misleading (except perhaps as a shorthand phrase) to speak of the *amount realized* as "commercially reasonable." Instead UCC § 9–504(3) reads, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." As White & Summers, *Uniform Commercial Code* § 26–9 (1971) put it:

   > The "method, manner, time, place and terms" tests are really proxies for "insufficient price," and their importance lies almost exclusively in the extent they protect against an unfairly low price.

   Thus the question is really one of fair market value.

debt—if the presumption is *in fact* rebutted.[3]

That thesis may be both illustrated and tested by a hypothetical example:

1. Assume a $100,000 debt, the subject of an unconditional guaranty, is in default.

2. Assume collateral is sold by the creditor without notice to the guarantor, realizing proceeds of $5,000.

3. Assume the sale was not commercially reasonable (so that the $5,000 also was not, in the sense employed in *National Boulevard Bank*), but the creditor proves that a commercially reasonable sale would have brought $20,000 (or proves in some other way that the fair market value of the collateral at the time of sale was $20,000).

Defendants would have it that they would be relieved from *any* liability as guarantors under that set of facts, even though the maximum harm to them from the lack of commercial reasonableness of the sale was $15,000. This Court will not have it so, and nothing in the "remedial" view of UCC Article IX that controls here[4] (as contrasted with the "punitive" view) requires that result. In the hypothetical example this Court would impose an $80,000 liability on the unconditional guarantor.

In other words the presumption referred to in *National Boulevard Bank* may be rebutted by a creditor's meeting any of several burdens, at least including:

1. proof that the sale itself was commercially reasonable (with nothing to show that the amount realized was less than fair market value); or

2. even though the price obtained at the sale was not "commercially reasonable" in the *National Boulevard Bank* sense, proof of what a "commercially reasonable" price (that is, fair market value) would have been.

That second alternative is effectively confirmed by UCC § 9–507(1), under which a debtor (here a guarantor) may recover damages caused by failure of notice—a provision whose thrust is that a creditor may recover only the difference between the amount owed and the fair market value of the collateral. It is also buttressed by defendants' waiver of commercial reasonableness of the manner of dealing (see n.1), so that the only issue open to contest is what *price* could reasonably have been obtained (fair market value under the circumstances). To adopt defendants' contrary contention would create the bizarre situation in which a presumption (that the value of the secured collateral equals the debt) is rebuttable only by facts that lead to an opposite *inference* (proof that the amount realized from the sale was "commercially reasonable") but not by facts directly *contradicting* the presumption (proof of what the fair value of the secured collateral really was).

Thus the proper test on the parties' cross-motions is whether there are material issues of fact as to the fair market value of the collateral. Once defendants' Draconian approach is rejected as unsupported by the law, there is no question that plaintiffs have posed such issues. Defendants cannot then prevail on their summary judgment motion.

---

**3.** Plaintiffs argue for a totally different impact (or more accurately lack of impact) stemming from the lack of notice. They point out UCC § 9–507(1) entitles the injured party to damages for "any loss caused by a failure to" provide the required notification. Plaintiffs contend defendants are not entitled to damages because they stated at their depositions they had no plans either to purchase the collateral or attempt to find more bidders. Were this Court not bound by *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 principles (and therefore by *National Boulevard Bank*), it would accept the consequences (though not the analysis) of that argument. After all, appropri-

ate effect must be given to defendants' inability to *require* a commercially reasonable sale as a matter of right (having waived that right). Under such circumstances the consequences of lack of notice should logically be limited to damages proximately caused by such failure to give notice. On the facts there were no such damages here. But because of the *National Boulevard Bank* holding, this Court must and will afford defendants the benefit of the presumption—and also the effects of its being rebutted.

**4.** See Opinion II, 515 F.Supp. at 990.

On the other side of the coin, there are indeed material issues of fact as to the precise values involved, but *at most* the values (even taking all reasonable inferences in favor of defendants) are these:

1. $544,225 was the price ultimately obtained for the equipment upon resale.[5] Defendants' argument that the price is "suspect" because CDC released a co-guarantor from liability under his guaranty is a non sequitur—that argument could only *reduce*, not *enhance*, the fair market value allocable to the equipment. All other evidence points to values well below the $544,225 figure, so that defendants could not complain of a summary judgment based on a credit in that amount.

2. $150,000 (60,000 tons at $2.50 per ton) is, under the evidence, the highest amount rationally attributable to Racran's "inventory"—a 60,000 ton mountain of material ("dust," "goop" or what you will) arguably capable of being reworked to recover some value. All higher speculative figures fail, even with all reasonable inferences drawn in defendants' favor:

(a) $6.00 a ton, the amount that Racran received when it was selling the dust, has no probative force. It is a gross receipt figure that does not take into account the cost of moving the mountain, a cost that would have had to be borne either by the seller (thus reducing that value) or by the purchaser (thus reducing the price). Taking transportation into account generates at most the $150,000 figure already referred to.

(b) All figures proffered by defendants did not take into account either the cost of processing or the cost of transportation.

In fact under the circumstances faced by CDC at the time of sale—obligated as it was to vacate the premises within a very short time—even the $6 per ton or the $2 to $2.50 per ton figures were unrealizable. CDC bought the mountain for $7,000, having been unable to find a purchaser. It ultimately had to abandon the property (a reasonable reflection of the absence of fair market value, for any rational creditor will of course act to maximize its current cash realization rather than creating a larger and likely-to-be-disputed claim against a guarantor). Thus the $150,000 represents the maximum credit allowable to defendants for the "inventory."[6]

### Conclusion

Defendants' motion for summary judgment is denied. On the other hand, plaintiffs' argument has essentially been that they are entitled to recover one of several possible amounts, so it is unclear to the Court whether they are prepared to accept summary judgment for the amount indicated in this opinion, waiving any larger claim (in the technical sense, the existence of material fact disputes affecting the amount to which plaintiffs are entitled would preclude summary judgment as to *any* specific amount). Accordingly final ruling on plaintiffs' motion is deferred pending advice from plaintiffs in that respect.

---

**5.** Plaintiffs have confirmed they always intended to give defendants the economic benefit of the resale. Defendants' conflict of interest arguments as to the resale do not substitute for evidence or otherwise preclude summary judgment.

**6.** Were this Court to have subscribed to the argument discussed at n.3, the credit to defendants for this item would have been $7,000 rather than $150,000. For the reason stated in n.5, the $544,225 credit for the equipment would be unchanged.