COMMERCIAL DISCOUNT CORPORA-
TION, et al., Plaintiffs,

v.

William S. KING, et al., Defendants.

No. 78 C 3442.

United States District Court,
N.D. Illinois, E.D.

Dec. 13, 1982.

See also, 515 F.Supp. 988.

---

David M. Schiffman, A. Bruce Schimberg, Sidley & Austin, Chicago, Ill., for plaintiffs.

Michael P. Myers, Adelman & Myers, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Commercial Discount Corporation ("CDC") and Leasematic, Inc. ("Leasematic," a CDC subsidiary) sued William S. King ("King") and Horace Rainey, Jr. ("Rainey") on their joint and several personal guaranty of Racran Corporation ("Racran") indebtedness. King and Rainey have moved for reconsideration of this Court's August 13, 1982 opinion ("Opinion III," 545 F.Supp. 455) denying their motion for summary judgment. In reliance on the principles announced in Opinion III, CDC and Leasematic have moved for summary judgment against King and Rainey for $2,020,986.28 plus interest. For the reasons stated in this memorandum opinion and order, the King-Rainey motion is denied and the CDC-Leasematic motion is granted.

### Procedural History

This Court's September 23, 1980 memorandum opinion and order ("Opinion I") granted summary judgment on the issue of liability against King. Opinion I at 1 said there was "no dispute ... as to King's execution and delivery of the guaranties nor as to their validity." King himself posed no issues of fact material to his liability,[1] raising questions only as to the measure of plaintiffs' recovery. *Id.* at 2.

King then moved to vacate the summary judgment decision because of supplemental affirmative defenses arising out of events occurring after plaintiffs' original motion was fully briefed. Those new defenses were based on plaintiffs' failure to provide notice of the sale of certain collateral in which they had a security interest. This Court's May 14, 1981 memorandum opinion and order ("Opinion II") granted King's motion to vacate but struck all but one of the new defenses.[2] 515 F.Supp. 988 (N.D. Ill.1981).

King's first defense claimed plaintiffs' failure to give notice of sale was an absolute bar to their obtaining a deficiency judgment. This Court ruled, however, it was bound by the law as announced by the Illinois Appellate Court for the First District: that such failure to provide notice simply created a rebuttable presumption that the proceeds from the collateral sale equaled the value of any outstanding debt. 515 F.Supp. at 990, *citing National Boulevard Bank of Chicago v. Jackson,* 92 Ill. App.3d 928, 48 Ill.Dec. 327, 416 N.E.2d 358 (1st Dist.1981). King's first defense was therefore insufficient as a matter of law. 515 F.Supp. at 990.

---

1. This Court's survey of King's affirmative defenses found none raised a genuine issue of fact material to King's liability. Opinion I at 2–5. In one of those defenses King claimed plaintiffs had failed to deal in a commercially reasonable *manner* with certain collateral and had failed to comply with obligations to King under Article 9 of the Illinois Uniform Commercial Code ("UCC," found in Ill.Rev.Stat. ch. 26 and cited simply as "Section—"). This Court held (Opinion I at 5) the fourth and fifth paragraphs of the guaranty—all-encompassing no-impairment-of-liability and waiver provisions—"provide a complete answer to [King's] arguments as a matter of law."

2. Though summary judgment on liability had not been entered against Rainey, he also filed supplemental affirmative defenses that were, insofar as now relevant, identical to King's. As discussed in the text, just one of King's supplemental affirmative defenses survived this Court's scrutiny. Rainey's corresponding affirmative defense also survived, but for convenience the text will speak only of "King's" supplemental affirmative defenses and will use the simple term "defense" instead of continually repeating the more awkward "supplemental affirmative defense."

King's second defense embraced the rule of *National Boulevard Bank*. But that rule could benefit King only if the UCC notice requirement, Section 9–504(3), were applicable to guarantors (as "debtors" for statutory purposes) and only if the right to notice were not effectively waived in the guaranty. Opinion II held a *debtor's* predefault waiver of the right to notice was void under the UCC. 515 F.Supp. at 990. Citing *Commercial Discount Corp. v. Bayer,* 57 Ill.App.3d 295, 14 Ill.Dec. 647, 372 N.E.2d 926 (1st Dist.1978) (*"Bayer"*), Opinion II then held Section 9–504(3) was applicable to guarantors (qua "debtors"), so that the parties were required to deal with the deficiency issue in the context of the *National Boulevard Bank* presumption.[3] 515 F.Supp. at 990–92.

Opinion III denied defendants' summary judgment motion and deferred ruling on plaintiffs' cross-motion for the same relief. Defendants had contended the *National Boulevard Bank* presumption entitled them to an outright discharge if the collateral were sold below its fair market value, even if plaintiffs proved the fair market value were in fact less than Racran's outstanding debt. Opinion III rejected defendants' "Draconian approach" and held plaintiffs could rebut *National Boulevard Bank's* presumption by showing either (1) the sale in fact realized the collateral's fair market value or (2) the collateral's fair market value, even though greater than the sale proceeds, was less than the amount owed. 545 F.Supp. at 456–57. Defendants' summary judgment motion was denied because plaintiffs posed factual issues as to the collateral's fair market value. *Id.* at 457. And because plaintiffs had not themselves identified which of several possible amounts they sought to recover, Opinion III deferred ruling on their motion for summary judgment. 545 F.Supp. at 458.

In sum Opinions I–III placed CDC and Leasematic within reach of winning summary judgment on their deficiency claim against King and Rainey. CDC-Leasematic had only to show beyond genuine factual dispute what deficiency existed after properly crediting King and Rainey for the sold collateral and Racran's seized inventory. Opinion III, 545 F.Supp. at 458. Defendants now urge the key support for that result is itself undermined.

### Defendants' Motion for Reconsideration

Defendants rely for their new contention on a decision by a division of the Illinois Appellate Court for the First District handed down just before Opinion III (but not then known to the parties or this Court), *State National Bank of Evanston v. Northwest Dodge, Inc.,* 108 Ill.App.3d 376, 64 Ill.Dec. 26, 438 N.E.2d 1345 (1st Dist.1982). Defendants argue (Mem. ¶ 7) *Northwest Dodge* shows "the First District no longer follows the rebuttable presumption rule enunciated in *National Boulevard Bank of Chicago v. Jackson."* They say the First District has now adopted the rule barring a deficiency judgment when a secured creditor fails to give notice before disposing of repossessed collateral. In effect defendants argue King's first supplemental affirmative defense, destroyed in the fire of Opinion II, has risen like a Phoenix from the ashes.

But the step from *Northwest Dodge* to defendants' desired result is an unjustified quantum leap, for the reasons treated in the next section of this opinion. At a minimum it is unclear whether *Northwest Dodge* stands for a rule universally applicable to failures to notify debtors (let alone guarantors). And even if the case were so construed, this Court would then have to predict the Illinois Supreme Court's resolution of the notification issue, in light of what would be a split within the First District as well as among Illinois Appellate Districts.

---

**3.** Failure to provide adequate notice does not, however, absolutely bar a deficiency judgment, but raises the presumption that the value of the secured collateral is equal to the amount of the debt. In order to obtain a deficiency judgment, the creditor has the bur-

den of rebutting the presumption and of proving that the amount collected from the sale was commercially reasonable.
92 Ill.App.3d at 930, 48 Ill.Dec. at 329–30, 416 N.E.2d at 360–61.

If put to that prognosis, this Court considers the Illinois Supreme Court would follow the *National Boulevard Bank* presumption rule—at least where a secured creditor in a commercial (non-consumer) transaction fails to notify a guarantor before selling collateral.

### 1. *Northwest Dodge*

*Northwest Dodge* involved an agreement between a bank and an automobile dealer under which:

1. The bank purchased at a discount the dealer's retail installment contracts on sales of recreational vehicles.

2. The dealer was given a 3% participation in the finance income from the installment contracts, one-third of which was credited to the dealer's reserve account at the bank.

108 Ill.App.3d at 378, 64 Ill.Dec. at 28, 438 N.E.2d at 1347. In 1976 the bank sued, claiming the dealer had failed to pay its proportionate share of refunds on prepaid accounts, as required by another provision of the agreement. In turn the dealer counterclaimed for damages allegedly caused by the bank's debiting its reserve account for "deficiencies" arising from the bank's sale, without notice, of certain repossessed vehicles. *Id. See also* 86 Ill.App.3d 90, 91–92, 41 Ill.Dec. 655, 656, 408 N.E.2d 1, 2 (1st Dist.1980).

In affirming a trial court judgment for the dealer on its counterclaim, the court emphasized the special contractual circumstances present (108 Ill.App.3d at 379, 64 Ill.Dec. at 29, 438 N.E.2d at 1348, footnotes omitted):

The Bank had the contractual right to debit the reserve account or to demand payment from Dodge for the full amount of any balance due on accounts as to which two or more installments were past due or which were uncollectible for any

reason. Had it pursued this contractual right of recourse the question of its right to a deficiency after selling the vehicles would not have arisen. By exercising its right to dispose of collateral under Article 9, however, the Bank was obligated to comply with the notice provision of section 9–504(3) . . . .

That deliberate emphasis tends to suggest *Northwest Dodge* may be limited to circumstances in which a non-notifying creditor has deliberately opted to be bound by the strictures of Section 9–504(3) rather than pursuing its alternative contractual remedy. That possible construction of *Northwest Dodge,* and its impact on this case, have not been addressed by the parties.

Perhaps a more significant limitation of *Northwest Dodge* derives from the court's rationale for choosing the "absolute bar" rule for creditors' failure to provide Section 9–504(3) notice. It was led to its choice by a solicitous concern for debtors (108 Ill. App.3d at 383, 64 Ill.Dec. at 31, 438 N.E.2d at 1350):

The debtor's right to redeem the collateral or to be present at its disposition is too important to be neutralized by construing the notice requirement as anything less than a condition precedent to the secured party's right to recover a deficiency judgment.[4]

None of that concern applies directly to a *guarantor* brought under the protection of Section 9–504(3). Such a guarantor has no ownership interest in collateral property to be "redeemed." Moreover, guarantors have *induced* the making of loans, not only by their personal guaranty but also by specifically waiving objections to ready collection by the creditor.

These distinctions suggest *Northwest Dodge*'s concerns and rationale would be misplaced in granting a guarantor the bene-

---

4. That same concern for debtors was manifested by the court's additional emphasis on the special facts of the case (108 Ill.App.3d at 379 n. 3, 64 Ill.Dec. at 29 n. 3, 438 N.E.2d at 1348 n. 3):

Moreover, by the Bank's actions Dodge was denied its right to pay off the Bank on

accounts in default and to repossess the automobiles itself. It is quite possible that Dodge, as an automobile dealer, could have obtained a higher price for the vehicles than did the Bank.

fit of the "absolute bar" theory.[5] Thus even if *Northwest Dodge* stated a general rule for *debtors* (and were not simply restricted on its facts to particular cases), such a "general rule" would not necessarily apply to guarantors too.

### 2. *Predicting the Illinois Supreme Court's Resolution of the Issue*

■ If *Northwest Dodge* were read as defendants suggest, it would create a split of authority *within* the First District.[6] Under such circumstances this Court must apply the Supreme-Court-predictive approach to satisfy its *Erie v. Tompkins* obligations. *See Bonanno v. Potthoff,* 527 F.Supp. 561, 563 (N.D.Ill.1981). On that score this Court shares fellow Judge Getzendanner's conclusion that at least as to guarantors the Illinois Supreme Court would follow the *National Boulevard Bank* "rebuttable presumption" rule. *National Acceptance Co. of America v. Medlin,* 538 F.Supp. 585, 588 (N.D.Ill.1982).[7] Two sets of considerations impel that result. One suggests the Illinois Supreme Court will reject the "absolute bar" rule entirely, while the other suggests that if the rule *were* adopted, it would be limited to debtors.

*A.* Because of the already-identified factual distinctions limiting *Northwest Dodge,* it adds little weight against "the majority [Illinois] view" favoring the presumption rule stated in *National Boulevard Bank. See* Davenport and Murray, "Illinois Code Comment," Ill.Ann.Stat. ch. 26, § 9–504, at 53–54 (Smith-Hurd 1982 Supp.). There is good reason for the Illinois Supreme Court to reject the "absolute bar" rule even for debtors: Section 9–507(1) provides an independent and adequate remedy for debtors harmed by secured creditors' failure to comply with Section 9–504(3). Section 9–507(1) grants a debtor a right to recover any losses caused by a creditor's noncompliance, with no mention of a denial of a deficiency judgment. *See National Acceptance Co.,* 538 F.Supp. at 588. *See also* Opinion III, 545 F.Supp. at 457.

*B. Northwest Dodge* itself demonstrates the "absolute bar" rule derives from a concern for debtors, making it more likely the Illinois Supreme Court would reject that rule for guarantors (particularly in a commercial non-consumer transaction like this one) even if it were to accept the rule for debtors. *Northwest Dodge* (108 Ill.App.3d at 381, 64 Ill.Dec. at 30, 438 N.E.2d at 1349) relied heavily on a recent Delaware Supreme Court case in which consumer-debtor concerns undergirded the choice of the "absolute bar" rule. *Wilmington Trust Co. v. Conner,* 415 A.2d 773, 780–81 (Del.1980).[8]

---

**5.** Indeed just such considerations led this Court's colleague Judge Aspen to conclude Section 9–504(3) does *not* prevent pre-default waiver of notice by guarantors. *National Acceptance Co. of America v. Wechsler,* 489 F.Supp. 642, 647–48 (N.D.Ill.1980). This Court observed in Opinion II it might follow Judge Aspen if it were "writing on a clean slate," but it felt constrained by the First District holding in *Bayer. See* 515 F.Supp. at 991–92. Defendants' reliance on the absence of notice of sale is doubly ironic, for they have disclaimed any plans to bid on the collateral involved or to interest anyone else in doing so. Lack of notice therefore caused them no harm whatever—a dramatic contrast to the effect of no notice in *Northwest Dodge. See* Opinion III, 545 F.Supp. at 457 n. 3.

**6.** Defendants claim (R.Mem. 5) there is no "split" in the First District, and if there were this Court should follow the "most recent" First District Appellate Court decision, citing 1A [Part 2] *Moore's Federal Practice* § 0.307[3], at 3098 (1982). It would be wooden in the extreme to apply that admittedly "general" rule here, where the contending decisions are so closely spaced in time and where, in any event, doubt exists as to the applicability of *Northwest Dodge* to the situation posed in this case.

**7.** Judge Getzendanner decided the question pre-*Northwest Dodge.* Though her view of the merits is the same as this Court's, her perception of the preliminary choice of law question (based on responsible authority) is not. *See* 538 F.Supp. at 588. On the latter subject, see the discussion in the Appendix to this opinion.

**8.** There is also a basic conceptual flaw in *Northwest Dodge's* reliance on case law from other jurisdictions. Both *Wilmington Trust,* 415 A.2d at 779–80, and *Atlas Thrift Co. v. Horan,* 27 Cal.App.3d 999, 1005–06, 104 Cal. Rptr. 315, 318–19 (3d Dist.1972) were decided by courts concerned with *preserving* an "absolute bar" rule that had existed *before* adoption of the UCC. Illinois had no such pre-UCC rule,

By contrast, Illinois statutory law (albeit in another context) has recognized the need to protect consumer-debtors and commercial actors in the marketplace is not identical: Illinois prohibits confession of judgment clauses *only* in consumer transactions. Ill. Rev.Stat. ch. 110, § 2–1301(c) (1982).

Judicial adoption of a comparable distinction would apply the rebuttable presumption approach to non-notified guarantors under Section 9–504(3) even if the "absolute bar" approach were adopted for non-notified debtors. Indeed, the Kansas Supreme Court has recently drawn that distinction even between commercial and consumer debtors, *Westgate State Bank v. Clark,* 231 Kan. 81, 642 P.2d 961, 968 (1982) (emphasis in original):

> In consumer transactions, where there is creditor misbehavior such as failure to sell in a commercially reasonable manner, a claim for a deficiency judgment is absolutely barred.... When, however, the debtor is a *commercial* entity, the Kansas courts should use the rebuttable presumption approach. It cannot be denied that the more sophisticated debtor is in a better position to grapple fairly with the creditor as to whether the sale was commercially reasonable or whether the unpaid balance of the debt exceeds the fair market value of the collateral.[9]

This Court predicts the Illinois Supreme Court would likely be persuaded by a comparable distinction for commercial guarantors, even were it to embrace the "absolute bar" doctrine for debtors as a whole or for consumer-debtors in particular. In either case the Illinois Supreme Court will not likely adopt a rule providing a windfall to commercial guarantors like King and Rainey.[10] *See* Opinion III, 545 F.Supp. at 456–57.

Issuance of the *Northwest Dodge* opinion therefore does not alter this Court's earlier denial of defendants' summary judgment motion.[11] Their proposed affirmative defense does not pose an absolute bar to plaintiffs' recovery of a deficiency judgment.

### Motion for Summary Judgment

■ Once the legal underbrush of defendants' affirmative defenses is cleared away, their undisputed liability is again exposed to view. Plaintiffs' motion now seeks to establish the *amount* of that liability beyond factual dispute under Fed.R.Civ.P. ("Rule") 56(c).

For that purpose plaintiffs have submitted the September 24, 1982 affidavit of CDC-Leasematic Vice President James Luchansky showing:

1. Plaintiffs' loan balance to Racran as of February 9, 1978 (the date King allegedly terminated his guaranty) was $3,233,708.20. Aff. ¶ 5.

2. Plaintiffs recovered $1,069,721.92 from the liquidation of Racran's accounts receivable, equipment and inventory, leaving a balance of $2,163,986.28. Aff. ¶¶ 6–8.

In response to Opinion III, plaintiffs have given defendants an additional credit of $143,000 for the sale of Racran's inventory.[12] Opinion III stated (545 F.Supp. at

---

so the same consideration is inoperative here. Pl.Ans.Mem. 2–4.

9. In fact the Kansas Supreme Court's carving out of a special rule for consumer-debtors was dictated by a specific provision of the Kansas Consumer Credit Code. *See* 642 P.2d at 965, 968. Thus that Court did not find any support for the absolute bar theory in the UCC itself.

10. Again this Court must emphasize the unfairness of allowing commercial guarantors, wholly unharmed by the lack of notice (for they admittedly would not have bid or procured others to bid at the collateral sale), to escape all liability on a $3.2 million debt secured by only $1.2 million in collateral—with creation of the debt having been induced by their guaranty. *See* Opinion III, 545 F.Supp. at 457 n. 3.

11. Defendants reassert the allegedly "unreasonable" manner of the sale of collateral. R.Mem. 7–9. As n. 1 reflects, however, defendants' guaranty specifically waived objections to the *manner* in which CDC handled the collateral, and this Court has ruled *that* pre-default waiver was not void. Opinion III, 545 F.Supp. at 456 n. 1.

12. As Opinion III reported, the "inventory" (whether valued at $7,000 or $150,000) was a pile of "goop." 545 F.Supp. at 458. That description of course does not extend to plaintiffs' multimillion dollar recovery here.

458) $150,000 was "the highest amount rationally attributable to Racran's 'inventory,'" even though only $7,000 was actually paid for it by CDC and included in the $1,069,721.92 credit.

Plaintiffs' deduction of the additional $143,000 thus gives defendants the *maximum* allowable credit, reducing the net principal balance to $2,020,986.28. Luchansky's Aff. ¶ 10 then calculates the interest due on that amount through August 31, 1982 as $1,910,856.37.

Defendants claim (Ans.Mem. 1) "apparent discrepancies" in plaintiffs' ledgers, submitted with Luchansky's affidavit. None of defendants' contentions, however, succeeds in casting any doubt on plaintiffs' "bottom line" amounts.

Defendants first question (Ans.Mem. 2–3) some ledger entries in the pre-1978 period. As plaintiffs correctly respond (R.Mem. 2–3), plaintiffs' ledger balance and Racran's own balance sheet agree almost exactly as of December 31, 1977—in fact Racran's books reflect a slightly *greater* indebtedness to plaintiffs ($301.62 out of an over $2 million total!) than plaintiffs' books show. As of December 31, 1977, therefore, there were no relevant "discrepancies" in plaintiffs' ledgers.

Defendants also assert (Ans.Mem. 2) a failure to reduce Racran's debt by a $553,-315 "payment" collected February 23, 1978. But plaintiffs refute that totally, showing (R.Mem. 4; Ex. F) the $553,315 payment entry was properly cancelled March 1, 1978 because that amount had not in fact been collected, so no loan balance reduction was due.

Finally defendants contend (Ans.Mem. 3) King was unaware of an inventory loan when he left Racran in February 1978. But the inventory loan is confirmed by *both* Racran's and plaintiffs' books (Pl.R.Mem. 4–5 and Ex. A) and by Racran's bankruptcy petition, sworn to by Rainey (*id.* Ex. G).

In sum, there is no genuine issue of fact as to plaintiffs' proof of the amount of defendants' liability. All that is lacking for final judgment is plaintiffs' submission as to additional interest on the $2,020,986.28 principal balance between August 31, 1982 and the date of judgment.

### Conclusion

Defendants' motion for reconsideration is denied. There is no genuine issue of material fact, and plaintiffs are entitled to a judgment against King and Rainey, jointly and severally, for $2,020,986.28 in principal plus interest equal to the sum of $1,910,-856.37 and supplemental interest through the date of this judgment order. Plaintiffs are directed to submit a proposed form of judgment order bearing today's date (accompanied by a calculation of the additional interest) on or before December 17, 1982.

### APPENDIX

Several recent published opinions by this Court have dealt with a District Judge's obligations under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), when the Illinois Supreme Court has not determined an issue of Illinois law and there is a dispute on that issue among intermediate Illinois Appellate Courts. *Slate Printing Co. v. Metro Envelope Co.,* 532 F.Supp. 431, 434 (N.D.Ill. 1982); *Bonanno v. Potthoff,* 527 F.Supp. 561, 563 (N.D.Ill.1981); *Commercial Discount Corp. v. King,* 515 F.Supp. 988, 990 (N.D.Ill.1981); *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323, 339 and n. 4 (N.D.Ill.1981); *National Can Corp. v. Whittaker Corp.,* 505 F.Supp. 147, 148–49 n. 2 (N.D.Ill.1981).

This Court's analysis in such diversity actions begins with what it has termed "the essential theory of *Erie:* that a federal court must decide substantive questions in diversity cases in the same way that a state trial judge counterpart sitting in the same location would." *National Can,* 505 F.Supp. at 148 n. 2. *Erie*'s entire premise is that a diversity litigant should be no better or worse off in substantive terms than a litigant presenting the identical claim or de-

fense in the state courts.[1] As the Supreme Court put it in the conflict of laws context in *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941):

> Otherwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.

That proposition impels the federal trial court in Illinois to ascertain and apply the substantive content of Illinois law just as its "coordinate state ... courts" would.

For precisely the same reason, *Klaxon* teaches that a state's choice of law rules are *part* of its substantive law to be applied by the federal courts sitting in that state. *Id.* Like all other states Illinois has external choice of law rules—what in law schools and in Restatement terms, and in the courts, are usually called "conflict of laws" rules. But more important for current purposes, Illinois also has an *internal* choice of laws rule, defining the effect of Illinois Appellate Court decisions as "Illinois law" (the object of the sometimes elusive search we federal judges engage in).

Illinois' "internal" choice of law rule is that a state trial court is *bound* by the decisions of all the intermediate Appellate Courts, but is bound by the Appellate Court *in its own district* when the Appellate Courts differ. *People v. Thorpe,* 52 Ill. App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977); *Garcia v. Hynes & Howes Real Estate, Inc.,* 29 Ill. App.3d 479, 482, 331 N.E.2d 634, 636 (3d Dist.1975). Faithful to its charge under *Erie* and *Klaxon,* this Court has stated that rule of Illinois law in each of the cited cases. And that has led this Court to conclude it was bound by decisions of the Illinois Appellate Court for the First District on questions decided differently by the First District Appellate Court and by Appellate Courts for other appellate districts. *See Slate Printing,* 532 F.Supp. at 434; *Commercial Discount,* 515 F.Supp. at 990; *Instrumentalist,* 509 F.Supp. at 339 and n. 4; *National Can,* 505 F.Supp. at 148–49 n. 2.

This Court's "method" of handling this special (but recurring) *Erie*-related problem has recently been criticized by our colleague Judge Prentice Marshall. *Kelly v. Stratton,* 552 F.Supp. 641, 644–645 (N.D.Ill. 1982). His criticism reflects a misunderstanding of this Court's approach and a misapprehension of the reasons for its adoption. Moreover, this area in which we differ involves a problem of universal scope and application. Hence the need for further clarification and elaboration.

\* \* \*

Choice of laws analysis exerts a special kind of intellectual fascination, somewhat akin to the fascination of "pilpul" for the Talmudic scholar. But (perhaps even because of the intellectualism of the choice of laws field) it is essential to avoid the trap of applying mechanistic rules in the area, while losing sight of the conceptual basis for those rules.

That danger is clearly present in the special branch of choice of law doctrines implicated by *Erie* and its progeny. This Court believes its approach to the federal courts' duty in choosing among conflicting Illinois Appellate Court decisions—one that adheres to Illinois' own resolution of that choice of law problem—is wholly true to *Erie's* teaching, as well as properly flexible in its application.

Judge Marshall correctly notes (*Kelly,* at 644) the Northern District of Illinois embraces several counties that lie in Illinois Appellate Districts other than the First (which is coterminous with Cook County). He also correctly points out (*id.* at 645) that in cases like *Kelly,* where all defendants are nonresidents of Illinois, a state

---

[1] This Court is no great fan of *Erie* in jurisprudential terms, having been persuaded early on to Professor Crosskey's view of this matter, as expressed in 2 *Politics and the Constitution in the History of the United States* ch. XXVI, and particularly at 916–19 ff. (1953). *See National Can,* 505 F.Supp. at 149 n. 2. But so long as the federal courts are bound to the *Erie* doctrine, we must be faithful to its underlying conceptual premise.

court plaintiff, as far as venue is concerned, may bring his action in the Circuit Court for any Illinois county. Ill.Rev.Stat. ch. 110, § 2–101 (1982) ("Section 2–101"). But Judge Marshall then proceeds to a mistaken conclusion (*Kelly,* at 644):

> Thus, the *National Can* approach is inconsistent with *Erie* in that it might require a federal court to apply a rule of decision that would not be used if plaintiff filed in state court.

That is simply not so.

Both Judge Marshall and this Court are endeavoring to serve the *Erie* purpose of thwarting forum-shopping. *See Erie,* 304 U.S. at 74–77, 58 S.Ct. at 820–22. But analysis demonstrates that this Court's adherence to the Illinois rule *precludes* forum-shopping (or perhaps more accurately, permits only such forum-shopping as Illinois state courts themselves provide), while Judge Marshall's approach *fosters* federal court forum-shopping that would not be available to the state court litigant.

First, the plaintiff forum-shopping on which Judge Marshall has focused is the creature of the *Illinois* venue statute, Section 2–101 itself. This Court's "*National Can* approach" adds not a whit to Illinois' own open invitation to forum-shopping when all defendants are nonresidents of Illinois. Judge Marshall's hypothetical plaintiff suing such defendants can bring his action in the state circuit court in *any* Illinois county. If his lawsuit is one on which the Illinois Appellate Courts have differed, plaintiff can choose the friendliest Appellate District and rely on the *Thorpe-Garcia* doctrine to bring him home a winner. So if he chooses instead to file in the federal court for the Northern District of Illinois, and that court applies First Appellate District law, the plaintiff gets precisely what he could, and would, have gotten by choosing to sue in Cook County Circuit Court.

Second, the identical analysis of course applies to any other case in which the Illinois venue statute permits a state court plaintiff to sue in Cook County.[2] If that is the only county in which he can sue, he will be bound by First Appellate District law whether he files in the Cook County Circuit Court or, under this Court's approach, in the federal court. And if he has a choice among counties and opts to sue in Cook (authorized "forum-shopping," courtesy of the Illinois General Assembly), he is entitled to have applied the identical rules of substantive law—those prescribed by the First Appellate District—if he comes into this Court instead.

Needless to say, the same proposition controls the case actually brought in the Cook County Circuit Court and then removed to this Court. *See Slate Printing,* 532 F.Supp. at 432 n. 1. In that situation this Court's treatment prevents the *defendant* from forum-shopping by exercising his right of removal.

Third, this Court's approach also does not permit (let alone invite) otherwise impermissible plaintiff forum-shopping when a federal diversity action could *not* have been brought in the Cook County Circuit Court, but could have been brought in another county within the geographic limits of the Northern District of Illinois. In *that* circumstance and assuming a split among the Appellate Court Districts—a situation this Court has not yet faced—the "*National Can* approach" would require the federal district court to apply the decisions of the Illinois Appellate Court for the District in which the county of proper state venue lies (for

---

2. Section 2–101 provides venue is generally proper in the county of residence of *any* properly joined defendant or in the county in which the transaction giving rise to the cause of action occurred. Moreover, the following Section 2–102(a) makes domestic and authorized foreign corporations, for venue purposes, "residents" of any county in which they have an office or do business. Not surprisingly, those provisions result in the fact most Northern District diversity cases could have been brought in Cook County Circuit Court.

It should be noted the *plaintiff's* county of residence is irrelevant for Illinois venue purposes, contrary to Judge Marshall's implication, *Kelly,* at 645. Plaintiff's county of residence will, however, indirectly indicate his judicial *district* of residence for federal venue purposes, 28 U.S.C. § 1391(a).

example, the Second Appellate District in the case of a Lake County lawsuit). This is so because, again, *that* is the law that would be applied by the state trial court where the state suit could have been brought. It is *that* state trial court to which this Court would then assimilate itself under *Erie.*[3]

Though Judge Marshall does not raise the more complex plaintiff forum-shopping issue just discussed, he does say (*Kelly,* at 645):

> ... *National Can* would enable a defendant to forum-shop by removing to federal court actions, brought in non-Cook County areas of the Northern District of Illinois, in which it wants to avail itself of the law of the First District of the Illinois Appellate Court.

Again, not so. In case of removal this Court's approach would refer to the law of the Appellate Court District for the county in which the state action *was* brought (just as this Court did in *Slate Printing*).[4] That treatment would call forth exactly the same rules of substantive law the Illinois venue statute would evoke if the case were not removed to this Court. Thus whether the focus is on plaintiff or defendant forum-

shopping, this Court's approach to this special "internal" choice of law problem adheres to the underlying principle of *Erie:* State, not federal, law governs.

What is most significant about all the examples discussed in the text and footnotes of this Appendix (and any other arcane variants that might be posited), however, is that in no instance does this Court's treatment *advance* the cause of forum-shopping. And if and to the extent it *permits* that device, it only mirrors what is equally available to the state court litigant. *Erie* asks (or commands) no more.

By way of contrast, the approach espoused by Judge Marshall[5] *will* invite forum-shopping—it *will* produce different results for the federal litigant from those he would obtain from the state courts—contrary to *Erie*'s intent. Judge Marshall would always attempt to "predict" how the Illinois Supreme Court would decide an issue upon which the Illinois Appellate Courts disagree. *See Kelly,* at 645.[6]

Admittedly there is responsible authority employing the "Supreme-Court-predictive" approach in the face of uncertain intermediate state court law. *See, Gates Rubber Co.*

---

**3.** At this point the Talmudic student seeking to go to the head of the class might pose this hypothetical: Suppose under Section 2–101 a state court plaintiff *could* sue in two different counties, neither of which is Cook County but both of which are within the limits of the Northern District. Suppose further those two counties are in different Appellate Court Districts and those districts differ as to a determinative rule of law. Suppose finally that plaintiff can and does sue instead in the Northern District federal court.

Question: What rule of law does this Court apply?

Answer: Certainly not the First District Appellate Court's, because the Illinois venue statute did not give the state court plaintiff *that* choice. Were he really intent on legitimate forum shopping, he *could have* chosen between the conflicting Appellate Courts by suing in state court in one or the other county, but he did not exercise that choice. Surely he should not be heard to complain if this Court chooses for him (in this case selecting one of the two available lines of authority, by using the Supreme-Court-predictive approach adverted to later in this Appendix).

**4.** This result is analogous to another application of *Erie* principles: the use of the *transferor* district court's forum-state choice of law rules when a transfer of a diversity suit is made pursuant to 28 U.S.C. § 1404(a). *See Van Dusen v. Barrack,* 376 U.S. 612, 638–39, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964).

**5.** In her decision referred to in the text of this opinion, our colleague Judge Getzendanner followed the same concept, though without as extended a statement as Judge Marshall's in *Kelly. See National Acceptance Co. of America v. Medlin,* 538 F.Supp. 585, 588 (N.D.Ill. 1982).

**6.** Indeed Justice Marshall there implies he would repair to the "predictive approach" whenever he would expect the Illinois Supreme Court to disagree with Appellate Court decisions, apparently even if the Appellate Courts are not "split." That notion may have some limited utility under *Erie* (as for example where the decided cases are old and the law has been in flux), but as a general operative principle it is subject to all the problems next explored in the text (and see n. 9).

*v. USM Corp.,* 508 F.2d 603, 606–07 (7th Cir.1975) (but see n. 9 of this Appendix); *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 284–85 (3d Cir.1980). Nevertheless, if the concern is (as it must be) fidelity to *Erie,* any general application of the predictive approach as urged by Judge Marshall is flawed.[7]

It must never be forgotten that the *Erie*-mandated search is for "state law." Nor may it be forgotten that the only reason we are required to make that search is that our state court counterparts are required to follow "state law," and we in turn are required to do as our state court counterparts do. If a state does not have an established rule for its trial courts to follow in the presence of divided authority, the federal diversity court *should* try to predict what the state's highest court would do—precisely because a state court trial judge would essay that same prediction.

But where, as in Illinois, "state law" itself includes a definitive rule as to the way to ascertain "state law" in case of intrastate appellate court disputes, we must follow that first "state law" to learn the second "state law." Examination of the post-*Erie* Supreme Court decisions that defined (and refined) the role of the federal diversity courts in this area demonstrates the validity of this view. And to the extent if any that lower federal court cases—including those in our circuit—may simply announce and indulge the state-Supreme-Court-predictive approach without attention to the forum-shopping it promotes, this Court is constrained to disagree with them.

After all, if that approach consistently prevailed in the federal courts of this Northern District, both plaintiffs and defendants *could* hope to obtain—by suing in or removing to this District Court—a rule of decision that would not govern the case if brought or left in state court.[8] Any diversity plaintiff who could sue in state court only in Lake County might instead sue in the Northern District federal court in the hope he can win a "prediction" opposed to the rule of decision prevailing in Illinois' Second Appellate District. And a diversity defendant sued in Lake County Circuit Court might remove to the Northern District federal court to try to escape an adverse Second Appellate District rule of decision.

There is an obverse side to the same coin: the "predictive" approach's potential for defeating litigants' justified expectancies. Assume a diversity plaintiff who *may* sue under the Illinois venue statute in the Circuit Court of Cook County, where he will have the benefit of a substantive rule of law pronounced by the First District Appellate Court. Congress has given that plaintiff the absolute right to invoke federal jurisdiction instead. It would do violence to the *Erie* principle to condition the exercise of that right on the potential loss—through an adverse "prediction"—of the substantive rights the plaintiff fully and justifiably views as his. And that analysis applies with equal force to a diversity defendant who, having the unfettered congressionally-conferred right to remove a state court suit to this District Court, must temper (or forego) exercise of that right because of concern that a "prediction" may rob him of substantive rights the *state* trial court was legally bound to give him.

7. As indicated at n. 9, the cases on which Judge Marshall leans for his general predictive approach cannot bear the weight he seeks to place on them.

8. Implicit in this discussion is the fact that in the Illinois appellate system, like the federal, its Supreme Court's docket is largely discretionary—its leave-to-appeal procedure is much like the United States Supreme Court's certiorari docket. And the Illinois Appellate Courts, like our Courts of Appeal, are the courts of last resort in the very great majority of cases. Thus the kinds of differing views among Appellate Districts with which this Appendix is concerned may coexist for extended periods of time without resolution by the Illinois Supreme Court—once again as in the federal system. Indeed that is the very reason the *Thorpe-Garcia* doctrine, dealing with conflicts among Districts, has had to be enunciated by the Illinois courts in the first place. Accordingly the federal district court that uniformly applies the predictive approach delivers something different to the litigants than they would have obtained in the state system.

In sum, the Supreme-Court-predictive approach is not responsive to the *Erie*-required search for "state law"—at least in Illinois under circumstances like those involved in Judge Marshall's *Kelly* case.[9] Such prediction *is* required, however, when (as in the case to which this Appendix attaches) there is a split of authority *within* the governing Appellate Court District. To the extent such prediction involves a degree of uncertainty for the litigants, it is uncertainty already present in the *state* law.

Thus in this limited final circumstance, a federal court's exercise of "creativity" is itself an adherence to *Erie* principles. After all, *Erie* does not promise absolute certainty any more than it promises to eliminate forum-shopping. *Erie* demands only that the federal courts' exercise of their diversity jurisdiction not cause added uncertainty and forum-shopping.[10]

**9.** In *Kelly* the conflicting Illinois Appellate Court decisions (most importantly, the decision in the controlling District under the *Thorpe-Garcia* rule) are highly contemporary (only a few years old). In that circumstance Illinois law requires adherence to the rule established in the controlling District. There have been other situations in which courts (including this one) have not followed antediluvian Illinois *Supreme* Court law in diversity actions because the trend of the law has since taken a very different turn. In those cases the federal courts have made the "prediction" as to what the state Supreme Court would do today. This was the situation in *Warner v. Gregory*, 415 F.2d 1345, 1346–47 (7th Cir.1969), *cert. denied*, 397 U.S. 930, 90 S.Ct. 817, 25 L.Ed.2d 112 (1970), on which Judge Marshall seeks to rely. Of course the same proposition may sometimes apply to Illinois *Appellate* Court decisions overtaken by time. This was the case in *Gates Rubber*, 508 F.2d at 606–07, the other case on which Judge Marshall places principal reliance. It is not now necessary to define the scope of those possibilities, but in all events they cannot support the general adoption of a "predictive" analysis in the face of Illinois' *Thorpe-Garcia* rule.

**10.** To the extent Judge Marshall's espousal of the "predictive" approach may be a reaction to the role forced on the federal courts by *Erie,* it strikes a responsive chord in this Court. No federal judge can relish the kind of ventriloquist's-dummy function forced by the *Erie* doctrine—one that is foreign both to the normal judicial search for the "right" rule of law and to what would seem the normal thrust of the Supremacy Clause. As n. 1 indicates, Professor Crosskey has made that point far more eloquently than any brief discussion here can do. But so long as the federal judiciary is not returned to the law-defining stature recognized by *Swift v. Tyson* as its proper place, the kind of discussion indulged in this Appendix is inevitable—as is the conclusion it reaches.