**Joan Carol ROBERTS, et al., Plaintiffs,**

v.

**WESTERN–SOUTHERN LIFE INSURANCE CO., et al., Defendants.**

**UNION NATIONAL BANK OF CHICAGO, Plaintiff,**

v.

**UNITED STATES FIRE INSURANCE CO., et al., Defendants.**

Nos. 82 C 6789, 82 C 5628.

United States District Court, N.D. Illinois, E.D.

July 29, 1983.

**538**

Robert A. Whitebloom and Robert J. Cooley, Chicago, Ill., for plaintiffs in 82 C 6789.

Donald L. Johnson and Marty J. Schwartz, Chicago, Ill., for plaintiffs in 82 C 5628.

James B. Davidson, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for defendants in 82 C 6789.

Edward P. McNeela, Neal R. Novak, McNeela & Griffin, Ltd., Chicago, Ill., for defendants in 82 C 5628.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

These cases present the question whether an insured person or entity may under Illinois common law maintain a claim against an insurer for its bad faith conduct in handling a claim under an insurance policy. We are invited to reconsider our recent holding in *Kelly v. Stratton,* 552 F.Supp. 641 (N.D.Ill.1982), that such a common law cause of action exists.

An Illinois statute, Ill.Rev.Stat. ch. 73, § 767 (1981), provides for an award of attorney's fees, costs, and a limited penalty upon a showing that an insurer acted vexatiously and unreasonably in connection with an insurance claim.[1] Some districts of the Illinois Appellate Court have interpreted the most recent version of § 767 as precluding any common law recovery based upon an insurer's bad faith. *See Hamilton v. Safeway Insurance Co.,* 104 Ill.App.3d 353, 60 Ill.Dec. 97, 432 N.E.2d 996 (1st Dist. 1982); *Tobolt v. Allstate Insurance Co.,* 75 Ill.App.3d 57, 30 Ill.Dec. 824, 393 N.E.2d 1171 (1st Dist.1979).[2] These cases rejected *Ledingham v. Blue Cross Plan,* 29 Ill.App. 339, 330 N.E.2d 540 (5th Dist.1975), *rev'd as to costs,* 64 Ill.2d 338, 1 Ill.Dec. 75, 356 N.E.2d 75 (1976), which held that an independent cause of action existed. Another court, in *Hoffman v. Allstate Insurance Co.,* 85 Ill.App.3d 631, 40 Ill.Dec. 925, 407 N.E.2d 156 (2d Dist.1980), while holding that § 767 barred a common law punitive damages claim against an insurer, held that the statute did not limit recovery of common law compensatory damages.

Given the lack of an Illinois Supreme Court ruling on the effect of § 767 and the divergent appellate holdings, the issue we

---

1. The pertinent portion of the statute reads:
    Attorney Fees. In any action by or against an insurance company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
    (a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
    (b) $5,000;
    (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action. Ill.Rev.Stat. ch. 73, § 767 (1981).

2. Actually, *Tobolt* appears to be based on the pre-1977 version of § 767, which did not provide for a separate penalty. However, the court also indicated that the 1977 amendment provided further support for its conclusion as to the pre-1977 statute. *Tobolt,* 75 Ill.App.3d at 70–71, 30 Ill.Dec. at 833–34, 393 N.E.2d at 1180–81. *Tobolt* relied primarily on *Debolt v. Mutual of Omaha,* 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (3d Dist.1978), which held that the pre-1977 statute covered the field. *Lynch v. Mid-America Fire & Marine Insurance Co.,* 94 Ill.App.3d 21, 49 Ill.Dec. 567, 418 N.E.2d 421, is contrary to *Debolt.* The court in *Lynch* declined to express a view as to the effect of the 1977 amendment. Insofar as *Tobolt* and *Hamilton* rely on *Debolt's* reasoning, they are undercut by whatever persuasive value *Lynch* has. We will consider the implications of this more fully *infra.*

faced in *Kelly* presented difficult questions of determination of state law under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The defendant in No. 82 C 6789 has challenged our application of *Erie* as well as our substantive holding in *Kelly.* In addition, a recent opinion by our colleague, Judge Milton I. Shadur, provides an extensive critique of our *Erie* analysis in *Kelly. Commercial Discount Corp. v. King,* 552 F.Supp. 841, 847–52 (N.D.Ill.1982). These factors militate in favor of a second look at these issues.[3]

I

The first question is the effect of the various Illinois intermediate appellate decisions concerning § 767. In *Kelly,* we held that while the appellate court decisions provided "data" for our determination of state law, they were not controlling. *Kelly,* 552 F.Supp. at 644–45. Rather, we held that we were required to determine how the Illinois Supreme Court would decide the issue. In doing so, we expressed our disagreement with Judge Shadur's analysis of the *Erie* issue. *See, e.g., Slate Printing Co. v. Metro Envelope Co.,* 532 F.Supp. 431, 434 (N.D.Ill.1982); *Bonanno v. Potthoff,* 527 F.Supp. 561, 563 (N.D.Ill.1981); *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323, 329 (N.D.Ill.1981); *National Can Corp. v. Whittaker Corp.,* 505 F.Supp. 147, 148–49 n. 2 (N.D.Ill.1981). In those cases, as in *Commercial Discount,* Judge Shadur held that a court of this district, in determining state law, must act as a state trial court. Where the various Illinois appellate districts are in conflict, Judge Shadur further held, a judge of the Northern District of Illinois must apply the law of the First District of the Illinois Appellate Court, the appellate district in which this federal district court sits. In *Commercial Discount,* he noted that were a case to be presented in which the proper Illinois venue was other than the First District, then the law of the district of proper venue must be applied. *Commercial Discount,* 552 F.Supp. at 850.[4]

It is true, as Judge Shadur suggests, that we must avoid applying a rule that would permit a litigant to forum shop by choosing to bring his action in federal court if he found the law of the relevant state appellate district unfavorable, hoping to find a more sympathetic ear on the federal bench. *See Bernhardt v. Polygraphic Co. of America, Inc.,* 350 U.S. 198, 203–04, 76 S.Ct. 273, 276–77, 100 L.Ed. 199 (1956); *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). However, we think that *Commercial Discount* begins with an erroneous premise: that a federal court sitting in diversity jurisdiction "must decide substantive questions . . . in the same way that *a state trial judge counterpart* sitting at the same location would." *Commercial Discount,* 552 F.Supp. at 847 (quoting *National Can Corp. v. Whittaker Corp.,* 505 F.Supp. 147, 148 n. 2 (N.D.Ill.1981)) (emphasis supplied). The error of this premise affects the remainder of the *Commercial Discount* analysis.

The proposition that we must act as state trial judges stems from a misapprehension of the commands of *Erie* and its progeny. *Erie* requires a federal court to apply the substantive law of the forum state; we take this to mean that we must apply the law that *ultimately* would be applied were the case to be litigated in the

---

**3.** In addition to the state court decisions discussed *supra,* there are several federal court decisions construing Illinois law on this point. Nearly all of them follow *Tobolt* and *Debolt. See Smith v. Metropolitan Life Insurance Co.,* 550 F.Supp. 896 (N.D.Ill.1982); *Strader v. Union Hall, Inc.,* 486 F.Supp. 159 (N.D.Ill.1980). *See also Hyler v. Prudential Insurance Co.,* No. 79 C 2507 (N.D.Ill. Aug. 3, 1982); *Henke v. Travelers Insurance Co.,* No. 80 C 5068 (N.D.Ill. Oct. 21, 1981). *Garman v. New York Life Insurance Co.,* 501 F.Supp. 51 (N.D.Ill.1981), re-

lied on *Ledingham* to hold that a plaintiff could recover punitive damages against an insurer, but like *Ledingham* it did not consider the effect of a § 767.

**4.** Judge Shadur also stated that unconflicting intermediate appellate decisions must be followed by a federal court in this district, even where no "First District law" exists. *Commercial Discount,* 552 F.Supp. at 848.

state courts. While intermediate appellate decisions exert upon us a high degree of persuasive force, and while they may be binding upon state trial courts, the law we must apply is that which the state supreme court would apply.[5] In a given case we may choose to follow an intermediate appellate ruling, but we may not end our analysis of state law with mere citation to such rulings where we are persuaded that the state supreme court would rule otherwise. *See generally In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 701 F.2d 1189, 1196–98 (7th Cir.1983) (Appeal of American Airlines, Inc.).

The policy behind this principle is *Erie*'s concern with avoiding forum shopping between state and federal courts. Applying the law that the state supreme court would follow is necessary if we are to avoid creating an incentive for such forum shopping. The "state trial court" approach creates an incentive for forum shopping in that it requires the federal courts to give more weight to state intermediate appellate decisions than they would be given in the state system. This may be illustrated by three examples.

In a case in which no supreme court decision exists and the appellate district of proper state venue has not yet taken a position on an issue, *Commercial Discount* would require a federal court to follow the law as declared by the other appellate districts. *Commercial Discount,* 552 F.Supp. at 848 (citing *People v. Thorpe,* 52 Ill. App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977) and *Garcia v. Hynes & Howes Real Estate, Inc.,* 29 Ill. App.3d 479, 482, 331 N.E.2d 634, 636 (3d Dist.1975)). However, the very fact that the various Illinois appellate districts sometimes conflict on an issue of law indicates the problem inherent in the state trial court approach. The appellate districts, it appears, do not consider each others' decisions binding; rather, they regard them as persuasive authority only. Thus, if a litigant filed suit in a state court in the First District and the only intermediate appellate decision on a pertinent issue was from the Fourth District, while the trial court presumably would follow the Fourth District ruling, on appeal the First District would not necessarily do so, if it found persuasive

**5.** *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967) ("While the decrees of lower state courts should be attributed some weight ... the decision [is] not controlling ... where the highest court of the state has not spoken on the point."); *King v. Order of Travelers,* 333 U.S. 153, 160–61, 68 S.Ct. 488, 492, 92 L.Ed. 608 (1948); *West v. A.T. & T. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940) ("[A]n intermediate appellate state court [decision] ... is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.*" (emphasis supplied)); *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 701 F.2d 1189, 1196–99 (7th Cir.1983) (Appeal of American Airlines, Inc.); *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 945 (11th Cir.1982); *Coleman v. Western Electric Co.,* 671 F.2d 980, 983–84 (6th Cir. 1982); *American Triticale, Inc. v. Nytco Services, Inc.,* 664 F.2d 1136, 1143 (9th Cir.1982); *Mott v. Mitsubishi International Corp.,* 636 F.2d 1073, 1074 (5th Cir.1981); *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981); *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661–63 (3d Cir.), cert. denied, 449 U.S. 976, 101

S.Ct. 387, 66 L.Ed.2d 237 (1980); *National Surety Corp. v. Midland Bank,* 551 F.2d 21, 29–31 (3d Cir.1977); *Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 607 (7th Cir.1975); *Calvert v. Katy Taxi, Inc.,* 413 F.2d 841, 846 (2d Cir. 1969); *Smith v. Metropolitan Life Insurance Co.,* 550 F.Supp. 896, 900 (N.D.Ill.1982); *Largoza v. General Electric Co.,* 538 F.Supp. 1164, 1166 (E.D.Pa.1982); *National Acceptance Co. v. Medlin,* 538 F.Supp. 585, 588 (N.D.Ill.1982); *Davis v. Drackett Products Co.,* 536 F.Supp. 694, 696–97 (S.D.Ohio 1982); *Sherman v. St. Barnabas Hospital,* 535 F.Supp. 564 (S.D.N.Y. 1982); *Day Enterprises, Inc. v. Crown Central Petroleum Corp.,* 529 F.Supp. 1291, 1296 (D.Md.1982); *Savini v. Kent Machine Works, Inc.,* 525 F.Supp. 711, 719 n. 8 (E.D.Pa.1981); *Strader v. Union Hall, Inc.,* 486 F.Supp. 159, 161–62 (N.D.Ill.1980); *Piatchek v. Fairview Reliable Loan, Inc.,* 474 F.Supp. 622, 625 (S.D.Ill. 1979); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 469 F.Supp. 836, 863 (N.D.Ill.1979), aff'd, 616 F.2d 1006 (7th Cir.1980). Of these cases, only *Smith v. Metropolitan Life, National Acceptance,* and *Strader* address the specific question here, that is, what a federal court should do where appellate courts of the state are in conflict. However, the principle of law stated in the other cases is nevertheless applicable here.

reasons to do otherwise. In such a case, if diversity of citizenship existed, the litigant favored by the Fourth District rule could file the case in federal court (or remove it, if there was diversity of citizenship, in the case of a non-Illinois defendant) and thereby obtain "insurance" that the favorable rule of law would be applied and upheld on appeal, were *Commercial Discount* to apply.

The same is true even where "First District law" exists. The First District has five divisions. It appears that the different divisions do not consider themselves bound by the holdings of other divisions. *See, e.g., Bonnano v. Potthoff,* 527 F.Supp. 561, 563–64 (N.D.Ill.1981) (Shadur, J.) (discussing conflicting holdings of Third and Fifth Divisions on issue of date of accrual of cause of action); *Commercial Discount,* 552 F.Supp. at 843–45 (discussing apparent difference in decisions in different divisions on question of effect of failure to give notice of sale of repossessed goods).[6]

To note an example of recent origin, a controversy existed within the First District over the question whether a prosecutor must justify his or her use, within a particular case, of peremptory challenges to exclude minority group members from a jury. *Compare People v. Gosberry,* 109 Ill.App.3d 674, 65 Ill.Dec. 99, 440 N.E.2d 954 (1st Dist., 3d Div.1982) and *People v. Payne,* 106 Ill. App.3d 1034, 62 Ill.Dec. 744, 436 N.E.2d 1046 (1st Dist., 3d Div.1982) *with People v. Newsome,* 110 Ill.App.3d 1043, 66 Ill.Dec. 708, 443 N.E.2d 634 (1st Dist., 2d Div.1982) and *People v. Teague,* 108 Ill.App.3d 891, 64

Ill.Dec. 401, 439 N.E.2d 1066 (1st Dist., 1st Div.1982). Because one division does not consider itself bound by the others' holdings,[7] application of the "law" of the First District where not all divisions have spoken may result in a litigant obtaining a result that would not obtain were the case to be litigated in state court.[8] *Commercial Discount,* therefore, permits a diversity litigant in whose favor the non-unanimous but not as yet uncontradicted rule runs to obtain "insurance" by bringing the case in federal court or removing it there.

■ The third type of forum shopping permitted by *Commercial Discount* is somewhat more subtle. The doctrine of that case requires federal courts to give more weight to state appellate decisions than the rendering courts themselves would give them. The "state law" that *Erie* requires us to follow also includes the power of a state court to reexamine its earlier holdings based upon "data" not considered in the earlier decision; *Erie,* we think, permits a federal court to exercise the same authority. As two noted commentators have stated,

> Unless a federal court is allowed this much freedom and flexibility, the Erie doctrine simply would have substituted one kind of forum-shopping for another. The lawyer whose case was dependent on an ancient or shaky state court decision that might no longer be followed within the state would have a strong incentive to bring the suit in or remove it to federal court, hoping that the state decision

---

**6.** We recognize that in both *Bonnano* and *Commercial Discount,* Judge Shadur held that where different divisions are in conflict, the so-called "Supreme Court predictive" approach must be followed. We agree. Here we refer to the potential of division within the First District to make the point that absent unanimity of all divisions within that district, a federal court cannot be sure what the "law" of the First District is. To apply a non-unanimous First District holding may result in giving that holding more weight than it would be given in the First District itself.

**7.** The same appears to be the case as between different panels of other districts. *Compare Anderson v. Wagner,* 61 Ill.App.3d 822, 19 Ill.

Dec. 190, 378 N.E.2d 805 (4th Dist. 1978) *with Woodward v. Burnham City Hospital,* 60 Ill. App.3d 285, 18 Ill.Dec. 137, 377 N.E.2d 290 (4th Dist.1978) (both concerning the constitutionality of medical malpractice statute of limitations).

**8.** For a detailed account of the confusion engendered by the failure of the various districts and divisions of the appellate court to follow each others' rulings, *see* T. Mattis & K. Yalowitz, Stare Decisis Among (Sic) the Appellate Court of Illinois, 28 DePaul L.Rev. 571 (1979). While this is perhaps lamentable, it nevertheless reflects "state law" within the meaning of *Erie* and we are therefore required to take account of it.

could not be impeached under the mechanical application of existing state precedents that the Erie doctrine was once thought to require. Moreover, to give state court decisions more binding effect than they would have in the state court system would undermine the ability of the federal courts to ensure that the outcome of the litigation be substantially the same as it would be if tried in a state court and subjected to that system's appellate process.

19 C. Wright, A. Miller & Cooper, Federal Practice and Procedure § 4507 at 89–91 (1982) (emphasis supplied).[9]

Thus, *Commercial Discount* does permit forum-shopping of a sort, in that a federal court is required to give state intermediate appellate precedent more weight than it would carry in other state appellate tribu-

nals and even in the rendering panel itself. These are "uncertaint[ies] already present in *state* law." *Commercial Discount*, 552 F.Supp. at 852 (emphasis in original). The view we espoused in *Kelly*—application in all cases of the "Supreme Court predictive" approach—has the disadvantage of being something less than a bright line, easily applicable rule.[10] It is, however, faithful to *Erie* and its progeny.[11]

■ In addition to its potential for encouraging forum shopping, *Commercial Discount* will, at least in some cases, give rise to a waste of litigants' and courts' resources. Where a state appellate court has ignored a critically important "datum" of state law—in *Kelly v. Stratton,* certain doctrines of statutory construction—and has reached a result that is incorrect even as a matter of state law, *Commercial Discount*

**9.** In *Kelly,* 552 F.Supp. at 644, we said that Judge Shadur's approach might result in a federal court applying a rule of decision that would not apply had the plaintiff filed in state court. In *Commercial Discount,* 552 F.Supp. at 849, Judge Shadur argued that we were incorrect. We respectfully differ. In a situation such as *Kelly,* in which Ill.Rev.Stat. ch. 110, § 2–101 (1981) applies, the Illinois plaintiff suing non-Illinois defendants may file his action in any Illinois county. As we understood *National Can Corp. v. Whittaker Corp.,* 505 F.Supp. 147, 148–49 n. 2 (N.D.Ill.1981), had such a plaintiff filed suit in this federal district, Judge Shadur would apply First District law. But since plaintiff could have filed the action in *any* Illinois county, that is not necessarily the law that would have applied had plaintiff filed in state court. We pointed this out merely as an apparent inconsistency in Judge Shadur's approach, which has as its intent the application of the same law that would obtain in a state court action. However, in *Commercial Discount,* 552 F.Supp. at 850 n. 3, Judge Shadur addressed this "uncertain state venue" question and stated that in such a case, the "Supreme Court predictive" approach to *Erie* should apply. *That is what we did in* Kelly. But at *id.* at 849, Judge Shadur seems to suggest, in apparent contradiction of his footnote 3, that in such a case First District law should apply, so that "the plaintiff gets precisely what he could, and would, have gotten by choosing to sue in Cook County Circuit Court." That is exactly the problem: in such a case a federal court *cannot* know that plaintiff is "choosing" Cook County Circuit Court (First District) law, as our federal district covers more territory

than the First District. We continue to believe that approach incorrect.

The problem of indeterminate state venue undermines the apparent advantage of bright-line predictability in *Commercial Discount.* In Illinois, venue is generally proper in the county of residence of any defendant. Ill.Rev.Stat. ch. 110, § 2–101 (1981). Domestic and authorized foreign corporations are, for venue purposes, "residents" of any county in which they do business or have an office. *Id.* § 2–102(a). In a case originally brought in federal court to which § 2–101 and 2–102(a) would apply, one cannot be sure that the plaintiff has "chosen" the First Appellate District, as the federal district in which we sit is geographically broader than the First District. *See Kelly,* 552 F.Supp. at 644. In some such cases, a plaintiff might well be "choosing" the Second or Third District, assuming that, based upon a defendant's residence, the action could have been brought in DeKalb, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, McHenry, or Will County.

**10.** A federal court is not, however, entirely without guideposts. We will describe some general rules we think we are required to follow *infra* at 543–545.

**11.** It might be objected that our examples of the type of forum shopping that *Commercial Discount* may encourage result from an overly broad reading of that decision. One might argue that while a federal district court must act as a state trial court, a federal court of appeals is to act as a state appellate court. If this is the rule of *Commercial Discount,* we think that it promotes the needless expenditure of litigants' resources, as we will further discuss *infra.*

would require us to follow the appellate court ruling and reach a similarly erroneous result, despite the existence of persuasive reasons for believing that the state supreme court would not so hold.[12] As Judge Shadur presumably would not require a federal appellate court to act as a state trial court (because the two are not "counterparts"), the result is to require the district court to commit error and leave it to the court of appeals to correct the error.[13] So read, *Commercial Discount* elevates form over substance and promotes the needless expenditure of courts' and litigants' resources.[14] We do not find in *Erie* or its progeny the rigidity that *Commercial Discount* appears to require.

The principles of Illinois *stare decisis* to which we have made reference must be recognized by a federal diversity court if it is to avoid the forum shopping potential recognized by Wright and Miller in the quoted passage. Again, the central principle is that we must give appellate court holdings their due where the supreme court has not spoken, but we must not give them more than their due. This will require re-

sort to the "Supreme Court predictive approach," but to do otherwise would be to ignore the policy of *Erie* and its progeny. That policy is the avoidance of forum shopping. When we apply the law that ultimately would be applied were the case litigated in state court, we are fully faithful to *Erie.* By contrast, to act as a state trial court, following intermediate appellate decisions that are erroneous as a matter of state law, not only would violate the policy of *Erie,* but would also elevate form over substance, as the court of appeals, assuming the role of its state counterpart, would apply the correct rule of state law.[15]

*Erie* requires us, in all cases, to apply the rule of law that the state supreme court would follow. Despite our rejection of the state trial court approach, however, we are not cast adrift without a rudder. Several general rules exist to guide our construction of state law.

■ One such rule is that a federal court should not attempt "dramatic innovation" in state law. *Murphy v. White Hen Pantry Co.,* 691 F.2d 350, 355 (7th Cir.1982). *See also Lamb v. Briggs Manufacturing Co.,* 700

---

12. In this regard, it should be noted that denial of leave to appeal by the Illinois Supreme Court carries no connotation of approval or disapproval of the appellate court's decision. *See People v. Vance,* 76 Ill.2d 171, 173, 28 Ill.Dec., 508, 513, 390 N.E.2d 867, 872 (1979).

13. If *Commercial Discount* requires the federal court of appeals to act as a state trial court and thus to ratify the district court's error of state law, the potential for forum shopping suggested earlier reaches full flower. Under such a rule, no court would apply the law in the way the Illinois Supreme Court would, and given the United States Supreme Court's relative disinclination to grant certiorari, most incorrect determinations of state law would go unreviewed by that court as well. We cannot believe that *Erie* requires such a result.

14. Such a rule also would conflict with the well established doctrine that where no authoritative resolution of a legal issue has been rendered by the state courts, a federal district court's construction of state law is entitled to great weight on appellate review. *Bernhardt v. Polygraphic Co. of America, Inc.,* 350 U.S. 198, 203–04, 76 S.Ct. 273, 276–77, 100 L.Ed. 199 (1956); *Lamb v. Briggs Manufacturing Co.,* 700 F.2d 1092, 1094 (7th Cir.1983).

15. In *Commercial Discount* Judge Shadur notes, 552 F.Supp. at 851 n. 8, that in the vast majority of cases, the Illinois appellate courts are the courts of last resort. Thus, he contends, if a federal district court applies the law that it believes the state supreme court would follow, the litigants obtain something different than they would have obtained in the state system. In an individual case, that may be true. But Judge Shadur's approach requires us to assume that no diversity case brought here would have, if brought in state court, reached the supreme court. Some would. Thus, *Commercial Discount,* in individual cases, delivers to the litigants something different than they would have obtained in the state system. As we have noted, *supra* at 542 & n. 13, unless *Commercial Discount* requires federal appellate courts to act as state trial courts too, at some point in the process a federal court rule will have the opportunity to apply the "correct" rule of state law. We do not think that *Erie* requires federal litigants to wait until appeal to obtain a correct construction of state law. Indeed, the court of appeals is no more qualified than we are to determine state law, as evidenced by the rule that on federal appellate review, a district court's construction of state law is entitled to great weight. *See* n. 15 *supra.*

F.2d 1092, 1096 (7th Cir.1983).[16] This appears to be a corollary of the rule that a federal court may not "substantially affect the enforcement of the right as given by the State." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945).

■ Another set of guideposts is set forth in *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657 (7th Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980):

An accurate forecast of [a state's] law, as it would be expressed by its highest court, requires an examination of all relevant sources of that state's law in order to isolate those factors that would inform its decision. The primary course that must be analyzed, of course, is the decisional law of the [state] [s]upreme [c]ourt. In the absence of authority directly on point, decisions by that court in analogous cases provide useful indications of the court's probable disposition of a particular question of law.... [R]elevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince.

Considered dicta by the state's highest court may also provide a federal court with reliable indicia of how the state tribunal might rule on a particular question.... [However,] [a]s Professor Charles Alan Wright has written, "much depends on the character of the dictum." Of somewhat less importance to a prognostication of what the highest state

court will do are decisions of lower state courts and other federal courts. Such decisions should be accorded "proper regard" of course, but not conclusive effect. *Id.* at 662 (footnotes omitted).[17]

■ In addition, it is clear that we may not disregard intermediate state appellate decisions in determining state law. *See, e.g., West v. A.T. & T. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). *See also Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). Many of the cases cited at n. 5 *supra* repeat that proposition; some go on to state that such decisions are to be given "presumptive" weight. *See, e.g., National Surety Corp. v. Midland Bank,* 551 F.2d 21, 30 (3d Cir.1977). Indeed, if every state appellate court to address an issue has reached the same conclusion, we would be remiss if we did not give those decisions a heavily presumptive weight. *Cf. Mitchell v. Young Refining Corp.,* 517 F.2d 1036, 1040 n. 3 (5th Cir.1975) (federal court must follow rule supported by "overwhelming weight of authority" from state courts). However, when following these guidelines, if we determine by our examination of state law that the intermediate appellate decisions were reached without consideration of a critically important datum of state law such that we are persuaded that the state supreme court would rule differently, our duty is not to apply the majority appellate rule mechanically but rather to follow the course the state supreme court would take.[18]

---

**16.** As we will explain *infra,* we did not violate this rule in *Kelly v. Stratton.*

**17.** *See also, e.g., In re Air Crash Disaster,* 701 F.2d 1189, 1197 (7th Cir.1983) (Appeal of American Airlines, Inc.) (federal court "must consult all of the available data that the Illinois [Supreme] [C]ourt would consider in reaching a decision on the issue.")

**18.** To posit an extreme case, one could envision a *Kelly v. Stratton*-like situation in which every state appellate district had followed *Debolt* and *Tobolt.* However, in examining the state decisions, the federal court in the hypothetical finds that in none of them was a hypothetical confer-

ence committee report on § 767 considered. That report contains a statement that the legislature did not intend to preclude a common law "bad faith" right of action. In such a case, a federal court would be constrained to hold that a common law cause of action exists, in our view. This hypothetical is not altogether different from cases in which state precedent exists but is so ancient and undermined by intervening developments that the federal court need not give it conclusive weight. *Cf. Bernhard v. Polygraphic Co. of America, Inc.,* 350 U.S. 198, 205, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956) (relying on early state precedent but suggesting that if there existed "a developing line of authorities that casts a shadow over the

The approach we advocate does not have the advantage of being a bright line rule. However, a federal court cannot avoid, at least in some cases, gazing into a crystal ball. While it is true that *Erie* requires us to parrot state law rather than determine the "better rule," we must avoid the danger of "giving 'a state court decision a more binding effect than would a state court of that state under similar circumstances.'" *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662 (3d Cir.) (quoting 1A J. Moore, Moore's Federal Practice ¶ 0.301 at 3077 (2d ed. 1979)), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). *Commercial Discount,* despite its bright line advantage,[19] may result in doing just that and thus may betray the policy of *Erie.*

## II

We must next apply these general rules to the cases at bar. First, we will briefly describe the present cases.

### A

*Roberts v. Western-Southern Life Insurance Co.,* (No. 82 C 6789) was removed from the Circuit Court of Cook County. Plaintiffs, two minor children and their mother, allege that they are the beneficiaries of three life insurance policies taken out by their father and husband. Mr. Roberts was killed in February 1981, allegedly while attempting to defend himself from a person wielding a gun. Plaintiffs allege that they complied with all conditions precedent to recovery on the policies but that the insurers refused to pay, without reasonable cause. The company denied coverage under an exclusion relating to death while committing or attempting to commit a felony. Plaintiffs request recovery on the policies and unspecified "compensatory and punitive damages."

*Union National Bank of Chicago v. United States Fire Insurance Co.,* (No. 82 C 5628) was filed in this court. Defendants are alleged to be incorporated and to have their principal places of business in states other than Illinois. As best we can tell, had the case been filed in state court, it could have been brought in any Illinois county. *See* Ill.Rev.Stat. ch. 110, § 2–101 (1981). The plaintiffs are both banks that purchased insurance policies to protect themselves against losses resulting from having extended credit, acquired, sold, delivered, given value, or assumed liability on the faith of any security, document, or instrument that proves to have been counterfeited, lost, stolen, or altered, or that carries forged signatures. They claim they filed timely and proper claims under the policies but that defendants refused to pay. Plaintiffs claim in counts 2 and 4 that defendants' conduct violated certain standards set forth in Illinois statutes for the settlement of claims, including the lack of a good faith attempt to settle and the absence of reasonable standards for the payment of claims. They also allege that defendants' conduct was "willful and malicious." They request compensatory relief amounting to the sums due on the policies, punitive damages, prejudgment interest, and attorneys's fees.

In *Roberts,* defendants have moved to strike plaintiffs' punitive damages claims. In *Union National Bank,* defendants have moved to dismiss the counts containing the punitive damages claims.

### B

As was implicit in *Kelly v. Stratton,* the question whether the Illinois Supreme

---

established one" a different rule could be followed); *id.* at 208–12, 76 S.Ct. at 279–81 (Frankfurter, J., concurring). *See also* 19 C. Wright, A. Miller & Cooper, Federal Practice and Procedure § 4507 at 87–88 (1982). In such a case, even the appellate court(s) that had rendered the decisions in question would be willing and able to reconsider their own rulings when the "omission" was called to their attention, whether on rehearing of the decided case or in a different case. *See Krentz v. Johnson,* 59 Ill.App.3d 791, 792, 17 Ill.Dec. 177, 178, 376 N.E.2d 70, 71 (2d Dist.1978) (petition for rehearing); *Illinois Central R. Co. v. Michigan Central R. Co.,* 18 Ill.App.2d 462, 499, 152 N.E.2d 627, 644–45 (2d Dist.1978). *Erie,* in our view, permits a federal court to exercise the same authority.

**19.** However, as noted *supra* at n. 9, given the problem of indeterminate state venue in actions brought initially in federal court, *Commercial Discount* may provide considerably less predictability than might appear at first blush.

Court would recognize a common law cause of action for damages based on an insurer's bad faith conduct is actually composed of two sub-questions. The first is that of the preclusive effect of Ill.Rev.Stat. ch. 73, § 767 (1981). If we determine that the legislature did not intend § 767 to limit the courts' common law authority, we must then determine whether the supreme court would recognize the common law tort. We will address these questions in turn.

*1*

The earliest version of § 767 was enacted in 1937. It provided that upon a court's determination that an insurer's refusal to pay a claim, or its suit to cancel a policy, was "vexatious and without reasonable cause," it could award a prevailing insured person "reasonable attorney's fees, as a part of the taxable costs in the action and in addition to all other costs," not to exceed a specified sum.[20] In 1967, the legislature amended § 767, increasing the amount of attorney's fees a court could award.[21]

In 1977, the legislature again amended the statute to its current version, which provides that the court may award the insured reasonable attorney's fees *and* a separate amount, not to exceed certain specified sums.[22] The legislature also changed slightly the wording of the finding needed to make the award, from "vexatious and without reasonable cause" to "vexatious and unreasonable." Ill.Rev.Stat. ch. 73, § 767 (1981).

Defendants first argue that the 1937 statute operated to preclude the courts' authority to recognize a common law bad faith tort. They read the 1967 and 1977 amend-ments as merely changing the amounts awardable under the statute and thus as retaining whatever preclusive effect the 1937 statute had. We do not agree with either of these arguments.

In 1937, and indeed in 1967, no Illinois court had yet recognized that an insured could maintain a lawsuit against an insurer for its bad faith handling of a first party insurance claim.[23] Defendants argue that because the legislature wrote on a clean slate in 1937, the remedy provided by the statute must be considered exclusive. *See Hall v. Gillins,* 13 Ill.2d 26, 147 N.E.2d 352 (1958) (recovery for wrongful death limited to maximum specified in Illinois Wrongful Death Act); *Cunningham v. Brown,* 22 Ill.2d 23, 174 N.E.2d 153 (1961) (recovery against tavern owners for injuries caused by intoxicated persons limited to Illinois Dramshop Act).

The present case differs from *Hall* and *Cunningham,* and not merely in degree. Both of those cases rejected common law actions seeking greater relief than the maximum allowed by statute where the elements of the common law action and the elements of damages recoverable were substantially similar to those of the statutory actions. Because there was an identity between the two actions, it was thought unreasonable to hold that the legislature intended the courts to permit recovery of amounts greater than those the legislature had concluded were justified for exactly the same conduct, and for the same "items" of damages. *See Hall,* 13 Ill.2d at 31–32, 147 N.E.2d at 355–56; *Cunningham,* 22 Ill.2d at 30, 174 N.E.2d at 157.[24] While the Illinois

---

**20.** The 1937 statute provided that the award of attorney's fees was not to exceed any of the following sums: 25% of the amount that the court or jury found the insured was entitled to recover, exclusive of costs; $500; or the excess of the court's or jury's award (exclusive of costs) over the company's offer of settlement prior to the lawsuit. Ill.Rev.Stat. ch. 73, § 767 (1937).

**21.** After the 1967 amendment, the statute read the same as it did in 1937, *see* n. 20 *supra,* with the exception that the second amount that the fee award was not to exceed was increased to

$1,000 from $500. Ill.Rev.Stat. ch. 73, § 767 (1967).

**22.** The pertinent portions of the statute are quoted *supra* at n. 1.

**23.** Moreover, even the developments in California law upon which *Ledingham* relied came after 1967.

**24.** *See also, e.g., Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157 (1961) (holding among other things that the differences between a widow's common law action for loss of consortium and

legislature in 1937 created a right that did not exist at common law,[25] that right, unlike those examined in *Hall* and *Cunningham,* was not substantially identical or "coincidental ... except as to recoverable damages," *Cunningham,* 22 Ill.2d at 30, 174 N.E.2d at 157, with the common law right sought by plaintiffs here. In particular, the right created by the statute left completely open an entire class of damages—compensation for harm caused by an insurer's bad faith conduct—that may be recovered under the common law tort. *See Fletcher v. Western National Life Insurance Co.,* 10 Cal.App.3d 376, 402–03, 89 Cal.Rptr. 78, 93–94 (1970) (plaintiff in bad faith case may recover economic losses as well as punitive damages).

In *Lynch v. Mid-America Fire and Marine Insurance Co.,* 94 Ill.App.3d 21, 49 Ill.Dec. 567, 418 N.E.2d 421 (4th Dist.1981), the court regarded the pre-1977 statute as merely granting the court authority to award attorneys' fees as an element of costs generally not permitted by Illinois common law, and not as evincing an intent "to cover the field of awarding compensation for bad faith or vexatious dealing by insurers." *Id.* at 25, 49 Ill.Dec. at 571, 418 N.E.2d at 425.[26] A statute that provided only for an award of a limited amount of attorney's fees cannot be considered to evince a legislative intent to provide a limited yet complete remedy (the *Hall v. Gillins* rationale) for an insurer's bad faith conduct. Awards of attorney's fees may deter, but they do not compensate for actual injury. The pre-1977 statute simply did not address the question of compensatory damages. In our judgment, before the 1977 amendment, § 767 did not preclude Illinois courts from recognizing a common law tort claim for an insurer's bad faith conduct.[27]

We turn next to the effect of the 1977 amendment. In determining the legislature's intent in 1977, we do not find *Hall v. Gillins* and *Cunningham v. Brown* controlling. In 1977, the legislature was no longer writing on a clean slate, for in 1975, *Ledingham* had been decided and as of 1977 had not been contradicted. Thus, in 1977,

---

an action for pecuniary loss under the wrongful death statute were not sufficiently significant to warrant recognizing an action for loss of consortium as an additional remedy).

**25.** It has long been the law in Illinois that attorney's fees may not be awarded absent a statute authorizing the award. *See, e.g., Murczek v. Powers Label Co.,* 31 Ill.App.3d 939, 335 N.E.2d 172 (1st Dist.1975).

**26.** The court in *Lynch* also disagreed with a significant statement in *Tobolt v. Allstate Insurance Co.,* 75 Ill.App.3d 57, 30 Ill.Dec. 824, 393 N.E.2d 1171 (1st Dist.1979). *Tobolt* followed *Debolt v. Mutual of Omaha,* 56 Ill. App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (3d Dist.1978), holding that the pre-1977 statute, under *Hall v. Gillins,* covered the field. *Tobolt* went on to state that "in 1977 the legislature agreed that [§ 767] had preempted the field when it amended that second to increase the recovery for vexatious delay." *Tobolt,* 75 Ill. App.3d at 70–71, 30 Ill.Dec. at 833, 393 N.E.2d at 1180. The *Lynch* court stated that it could not see how the intent of the 1977 amendments related to the pre-1977 intent: "Where legislation is amended to grant a power expressly, the amendment has been interpreted to indicate a legislative acknowledgement of a previous lack of that power. By analogy ... [,] amendments to add provisions indicating a legislative intent to preempt a field could be deemed to be an acknowledgement that the provisions amended did not previously preempt." *Lynch,* 94 Ill. App.3d at 25–26, 49 Ill.Dec. at 571, 418 N.E.2d at 425 (citation omitted). Moreover, we are unsure of the basis for the conclusion in *Tobolt* that the 1977 amendment indicated the legislature's "agreement" that the statute was preemptive, since at that time no court had so held or had even addressed the question, at least not in a reported decision.

**27.** None of the federal cases defendants cite considered the impact of the pre-1977 statute. While *Strader v. Union Hall, Inc.,* 486 F.Supp. 159 (N.D.Ill.1980) adopted the reasoning of *Debolt,* it actually concerned the post-1977 statute. *Id.* at 161 n. 4.

In arguing that the pre-1977 statute preempted the field of compensation for an insurer's bad faith, Western-Southern relies upon two unsuccessful attempts to amend § 767. However, neither of these bills was voted down by the legislature; rather, each died in committee without a vote. We fail to see how we can draw any conclusion whatsoever from the lack of success of these proposals, and certainly not the conclusion urged by Western-Southern: it is just as likely, for example, that the 1972 proposal failed because the legislature felt the amendment unnecessary to express what it meant in the pre-1977 act.

an Illinois appellate-level court had recognized a common law right of recovery based on an insurer's bad faith conduct,[28] and no court had yet considered the preclusive effect, if any, of § 767. In these circumstances, *Hall v. Gillins* does not control because the "common law," such as it was in 1977, had recognized a right to recover in the *Ledingham* situation.[29] *See Wright v. Central Du Page Hospital Assn.,* 63 Ill.2d 313, 326–27, 347 N.E.2d 736, 742 (1976).

Like the pre-1977 statute, the post-1977 statute aims at something different than the common law tort and does so in a different manner than the common law action. As we will discuss *infra,* the statute permits a penalty—punitive damages—to be awarded on a showing of "vexatious and unreasonable" conduct, probably an objective standard, *see Evaluation Systems, Inc. v. Aetna Life Insurance Co.,* 555 F.Supp. 116, 120–21 (N.D.Ill.1982), while under Illinois common law, punitive damages may be awarded only where the defendant has acted with fraud, actual malice, violence, oppression, or with such gross negligence as to indicate a wanton disregard of the rights of others. *See Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 186, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978). Moreover, an award can be made under § 767 even absent a showing of actual injury which would justify an award of compensatory damages in tort. Thus, the statute creates a standard for recovery that is easier to satisfy than that under the common law tort. *Smith v. Metropolitan Life Insurance*

*Co.,* 550 F.Supp. 896 (N.D.Ill.1982), in which the court stated that the recovery permitted by § 767 and the common law tort of bad faith are "totally duplicative," *id.* at 900, is, in our view, incorrect.

In addition, the court in *Smith* suggested that the "compensatory damages" still available under the *Tobolt* view of § 767—recovery on the insurance policy, attorney's fees, and costs—duplicate those available under the common law tort. However, in a common law action, other compensatory damages may be available, for example, other pecuniary losses caused by the insurer's conduct. *See generally Fletcher v. Western National Life Insurance Co.,* 10 Cal.App.3d 376, 402–03, 89 Cal.Rptr. 78, 93–94 (1970). Even after the 1977 amendment, § 767 does not address such compensatory relief. For these reasons, the recovery permitted under the statute is significantly different from that allowed under the tort recognized in *Ledingham.* Thus, a conclusion that § 767 permits the same type of recovery as would be allowed under the common law tort, while merely limiting the amount, as in *Hall v. Gillins,* is incorrect.

To determine the legislature's intent when it amended § 767, we look first to the language of the statute. *See, e.g., Potts v. Industrial Commission,* 83 Ill.2d 48, 51, 46 Ill.Dec. 172, 174, 413 N.E.2d 1285, 1287 (1960). While the language of the current § 767 clearly creates a right to recover attorney's fees and a penalty, it nowhere declares or suggests that the statute is the exclusive remedy for injuries caused by an

**28.** Western-Southern attempts to avoid the effect of *Ledingham* by arguing that because the defendant there was a "health care service corporation" not subject to the Illinois Insurance Code, *see* Ill.Rev.Stat. ch. 32, § 553 (1981), the case has no application in the insurance context and cannot be considered authority for the existence of a bad faith tort action against an insurer. While it may be true that the defendant in *Ledingham* was exempt from § 767, the case cannot be read so narrowly. The court's decision, which referred to the parties' relationship as one between "health insurance insurer and [ ] policy holder," *Ledingham,* 29 Ill.App.3d at 345, 330 N.E.2d at 545, makes a broad statement of policy that can only be read as applying to insurers generally. *Ledingham* may not construe § 767, but it certainly construes Illi-

nois tort law. Defendant cannot, by reading it in the suggested manner, limit its effect as a matter of Illinois common law.

**29.** Moreover, in 1973, a different panel of the same court that decided *Ledingham* implicitly recognized the possibility of a common law bad faith action against an insurer. *See Wallace v. Prudential Insurance Co.,* 12 Ill.App.3d 623, 299 N.E.2d 344 (5th Dist.1973). In addition, *Ledingham* received fairly widespread publicity, at least among the bar of this state, in a November 1976 article in the Illinois Bar Journal. *See* R. Teeple, "When, If Ever, Are Punitive Damages Recoverable in an Illinois Contract Action," 65 Ill.Bar.J. 152, 157–58 (1976).

insurer's bad faith conduct.[30] Moreover, it is clear that when the legislature wishes to declare that a statutory remedy is to be exclusive, it knows how to make its intention known. *See, e.g.,* Ill.Rev.Stat. ch. 48, § 138.5(a) (1981) (worker's compensation) ("No common law or statutory right to recover damages from the employer . . . for injury or death sustained by an employee while engaged in his line of duty . . ., other than the compensation herein provided, is available . . . .").

In addition, even apart from what we have termed the "legislative history" of the 1977 amendment, upon which *Kelly v. Stratton* was in large part based, established tools of statutory construction would require us to construe the statute so as not to cover the field. *Ledingham* was, as of 1977, binding on all Illinois trial courts. *See Commercial Discount,* 552 F.Supp. 841, 848 (citing *People v. Thorpe,* 52 Ill.App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977); *Garcia v. Hynes & Howes Real Estate, Inc.,* 29 Ill. App.3d 479, 482, 331 N.E.2d 634, 636 (3d Dist.1975)). Although the doctrine was not at that time firmly established, for example through supreme court approval, it was nevertheless the "common law" of Illinois.[31] As a general rule, statutes in derogation of the common law are strictly construed in favor of those sought to be subjected to their operation, here an insured who would have had, under *Ledingham,* a common law action in tort. *See Barthel v. Illinois Central Gulf R. Co.,* 74 Ill.2d 213, 220, 23 Ill. Dec. 529, 533, 384 N.E.2d 323, 327 (1978); *Summers v. Summers,* 40 Ill.2d 338, 342, 239 N.E.2d 795, 798 (1968). Because the language of § 767 bears no indication that the remedy provided there is to be exclusive, it

should not be read as precluding the common law remedies of insured persons.

The circumstances surrounding the adoption of the 1977 amendment provide further support for this conclusion. In *Kelly* we noted that during final consideration of the amendments, the floor manager in the Illinois House of Representatives noted that the bill had "[come] out of the Insurance Laws Study Commission," and that the original version had been amended "to conform with some of the problems that the industry had." *Kelly v. Stratton,* 552 F.Supp. at 647. Because of the reference to the Insurance Laws Study Commission, we looked to the Commission's 1977 report ("Final Report"). The key statement in the Final Report's discussion of the amendment was that the Commission had "thought that the insurance industry might have taken the opportunity to establish statutory limits on the amount of punitive damages. This was not done." *Kelly,* 552 F.Supp. at 648 (quoting Final Report at 19). The Final Report, which refers to developments in California law concerning "bad faith" cases, provides further support for the proposition that *Ledingham*-type innovations in the law were known to the legislature when it enacted the 1977 amendment to § 767. The Final Report is thus relevant as helping to explain the contemporaneous conditions and existing circumstances surrounding the 1977 amendment. *See Richter v. Collinsville Township,* 97 Ill.App.3d 801, 807, 53 Ill.Dec. 165, 170, 423 N.E.2d 549, 554 (5th Dist.1981).

Given our discussion of the applicable Illinois doctrines of statutory construction, we need not refer to the Final Report to support the conclusion that § 767 does not

---

**30.** Western-Southern argues that the phrase "[i]n any action," as used in § 767, means "in *every* action." We agree. *See, e.g., People ex rel. Ocean Accident & Guarantee v. Van Cleave,* 187 Ill. 125, 134–35, 58 N.E. 422, 425 (1900). However, the statute does not declare that the statutory penalty is the exclusive means for compensating an insured. The fact that a court is permitted to award a penalty in every case does not in itself indicate that common law damages and penalties are barred.

**31.** Despite its reliance on a California decision, *Ledingham* was not contrary to Illinois decisional law. It has long been the law in Illinois that despite the existence of contractual duties between two parties, the law sometimes imposes "implied" duties the breach of which is tortious. *See Nevin v. Pullman Palace Car Co.,* 106 Ill. 222 (1883); *see also Illinois Sterling, Inc. v. KDI Corp.,* 33 Ill.App.3d 666, 670, 338 N.E.2d 51, 55 (2d Dist. 1975).

evince a preclusive intent. In any event, Western-Southern's arguments that we should not consider the report fall short of the mark.

Western-Southern's main argument is based on the affidavit of former State Representative Bernard E. Epton ("Epton"), prepared for the purposes of this case. Epton was a member of the general assembly from 1969 through 1983, a member of the House Insurance Committee, and chairman of the Insurance Laws Study Commission ("Commission") from 1971 through 1983. He signed the Final Report, along with the other Commission members. In his affidavit ("Epton Aff."), he states that he, industry representatives, and other members of the Commission were of the view that § 767, both before and after the 1977 amendment, "provided the sole source of recovery in Illinois by a first party insurance claimant" for an insurer's bad faith conduct in handling a claim. Epton Aff. ¶ 6 at 5. Epton terms this an "expressed understanding." *Id.* We wonder where it was "expressed"; it certainly was not in the Final Report or the statute. In any event, the opinions of individual legislators as to the meaning of legislation do not appear to be relevant under Illinois law, nor does the action of any lobby involved in the passage of legislation. *See Eddy v. Morgan,* 216 Ill. 437, 75 N.E. 174 (1905). Moreover, our reliance on the Final Report is based on its indication of the contemporaneous conditions surrounding the passage of the amendment to § 767, and as such it is far more reliable than Epton's after-the-fact post hoc recollection of those conditions.[32]

As a general rule, post-passage remarks of legislators "are of negligible value in ascertaining the intent of [the legislature] in passing [the statute]." *Skelton v. General Motors Corp.,* 660 F.2d 311, 319 n. 17 (7th Cir.1981) (federal law) (citing *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974)), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1983).[33]

Epton also asserts that the insurance industry was behind the bill, as evidenced by the nearly unanimous votes of both houses of the legislature.[34] This, he contends, indicates a consensus that the bill, as amended, "struck an acceptable balance between affording a first party insurance claimant a limited and statutory right to recover a punitive amount from a first party insurer on the one hand and setting a maximum recovery limit for such punitive recovery on the other hand." Epton Aff. ¶ 6 at 4–5. Under *Eddy v. Morgan* and *Skelton,* Epton's interpretation of the vote does not appear relevant. As we have noted, the legislature is clearly able to make statutory remedies expressly exclusive when it wishes to do so. If such a "consensus" actually existed, we wonder why it was not inserted into the statute or at least reflected in the legislative history. In any event, one need not disagree with Epton's conclusion to deny it any great weight. While the legislature may have intended to limit the penalties recoverable *under the statute,* it did not intend to limit an insured's common law remedies.[35] Epton's affidavit does not detract from the weight of the Final Report.[36]

---

**32.** This also disposes of Epton's statement that the Commission did not draft the bill. Epton Aff. ¶ 4 at 2. Our consideration of the Final Report was not based on any indication that it represented the "intent" of the Commission's members. This also means that Epton's statements that the Commission did not hold hearings on the bill, *id.,* while interesting, do not undermine our consideration of the Final Report.

**33.** This principle also disposes of Epton's conclusion that the report was drafted in haste and is misleading. Epton Aff. ¶¶ 5, 6 at 3–4.

**34.** We find interesting the implication that the bill would not have done so well had the industry not backed it.

**35.** This is not an incongruous interpretation, for as we have noted, the standard for recovery of the § 767 penalty is lower than that for recovery of common law punitive damages. Thus, one may read § 767 as limiting the recovery available on the lesser statutory showing but leaving open the possibility of additional recovery on a different and greater showing.

**36.** Western-Southern also contends, along with Epton, that the Commission's legislative man-

We must next consider the Illinois decisions concerning the post-1977 statute. *Hoffman v. Allstate Insurance Co.,* 85 Ill. App.3d 631, 40 Ill.Dec. 925, 407 N.E.2d 156 (2d Dist.1980), holds that § 767 bars a common law claim for punitive damages but leaves open recovery of compensatory damages. *Tobolt v. Allstate Insurance Co.,* 75 Ill.App.3d 57, 30 Ill.Dec. 824, 393 N.E.2d 1171 (1st Dist.1979) may be read to hold that the post-1977 statute precludes any common law recovery based on an insurer's bad faith. *Hamilton v. Safeway Insurance Co.,* 104 Ill.App.3d 353, 60 Ill.Dec. 97, 432 N.E.2d 996 (1st Dist.1982), *Smith v. Metropolitan Life Insurance Co.,* 550 F.Supp. 896 (N.D.Ill.1982), and *Strader v. Union Hall, Inc.,* 486 F.Supp. 159 (N.D.Ill.1980) are in accord with *Tobolt* but add little to the analysis. As noted earlier, *Tobolt* relies heavily on *Debolt v. Mutual of Omaha,* 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (3d Dist.1978), and thus its persuasive impact is undercut by our previous holding, *supra* at nn. 2, 26, that *Lynch v. Mid-America Fire and Marine Insurance Co.,* 94 Ill. App.3d 21, 49 Ill.Dec. 567, 418 N.E.2d 421 (4th Dist.1981), not *Debolt,* correctly stated Illinois law.[37]

None of these cases considered the contemporaneous conditions surrounding the passage of the 1977 amendment to § 767, nor did they consider the doctrines of statutory construction to which we have adverted. We think that the Illinois Supreme Court, were it to consider the impact of § 767, would base its decision on these well-settled doctrines. *See Kelly v. Stratton,* 552 F.Supp. at 648.

We cannot draw from § 767 legislative intent to limit recovery of compensatory or even punitive damages under common law. It is at least as likely that it meant to create a penalty that an insured could recover with a showing less than that needed to recover punitive damages under common law and that could be recovered even absent a showing justifying an award of compensatory damages. By doing so, however, the legislature did not necessarily mean to preclude recovery of a common law award, in a proper case. In light of the doctrines of statutory construction referred to earlier, this is, in our view, the correct reading of the statute. Following the "Supreme Court predictive approach" to the *Erie* question presented here, we think that the Illinois Supreme Court would read the statute as we have.[38]

---

date had expired and that the Report thus somehow is a nullity. Our reliance on the Final Report was based on its description of the context in which the amendment to § 767 was passed. The expiration of the Commission's mandate does not detract from the Report's weight on that score.

**37.** *Tobolt's* only addition to *Debolt* was the statement that the 1977 amendment indicates the legislature's "agreement" with the conclusion that § 767 is preemptive. *See* n. 26 *supra.* That statement was unsupported, and *Erie* does not require us to follow it. *See In re Air Crash Disaster,* 701 F.2d 1189, 1196 (7th Cir.1983) (Appeal of American Airlines, Inc.).

**38.** Western-Southern makes several other arguments. First, it relies on several unsuccessful proposed amendments to § 767 after 1977. All of these proposals died in committee; none came to a vote. Unsuccessful attempts to amend legislation generally are an uncertain guide to legislative intent, *see Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 382 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969), particularly as to the intent of an earlier legislature, *United States v. United Mine Workers,*

330 U.S. 258, 281–82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947). As noted *supra* at n. 27, we simply do not know what the legislature meant when it did not adopt these proposals. Second, defendant argues that the legislature's failure to act after *Debolt* and *Tobolt* indicates its agreement with the holdings in those cases. However, the legislature also failed to act after *Hoffman,* which contradicts *Debolt* and *Tobolt.* Perhaps it intends to let the courts work this one out, at least until there is a definitive ruling. Third, defendant argues that permitting a common law "bad faith" tort would conflict with the legislature's intent, expressed in § 767, that "the court," not the jury, make the finding of vexatious and unreasonable conduct. It cites an early case under the 1937 statute, *Stewart v. Guarantee Trust Life Insurance Co.,* 321 Ill.App. 588, 53 N.E.2d 476 (1st Dist. 1944), which holds that the provision in the statute permitting the court to award attorney's fees "as part of costs" is constitutional as against the right to a jury in civil cases, *see* Ill.Const. art. I, § 13. The current statute is, of course, different, permitting recovery of a penalty as well. The most that can be said is that the legislature intended only the statutory penalty

*2*

Our holding that § 767 was not meant to cover the field of compensation for an insurer's bad faith conduct does not end the inquiry. In order to decide the present motions, we must go on to consider whether the Illinois Supreme Court would follow *Ledingham* and recognize a common law "bad faith claims practices" tort. We look first to the intermediate Illinois appellate decisions on the issue.

*Ledingham v. Blue Cross Plan,* 29 Ill. App.3d 339, 330 N.E.2d 540 (5th Dist.1975), *rev'd as to costs,* 64 Ill.2d 338, 1 Ill.Dec. 75, 356 N.E.2d 75 (1976), followed California law and held that an insurer owes its insured an implied-in-law duty of good faith and fair dealing, the breach of which gives rise to a cause of action in tort. *Debolt v. Mutual of Omaha,* 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (3d Dist.1978), which relied primarily on the supposed preclusive effect of § 767, criticized *Ledingham.* *Lynch v. Mid-America Fire & Marine Insurance Co.,* 94 Ill.App.3d 21, 49 Ill.Dec. 567, 418 N.E.2d 421 (4th Dist.1981), followed *Ledingham* as to the existence of the common law tort. *Hoffman v. Allstate Insurance Co.,* 85 Ill.App.3d 631, 40 Ill.Dec. 925,

407 N.E.2d 156 (2d Dist.1980), implicitly recognized that a common law bad faith action could be maintained.[39] The other Illinois and federal cases concerning § 767 rely upon the preclusive effect of the statute and do not address the underlying rationale of *Ledingham* and "bad faith" cases from other states.

In *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978), the supreme court noted that the general rule against awarding punitive damages in breach of contract actions "ha[s] no application where ... the cause of action is premised upon a separate and independent tort." *Id.* at 187, 23 Ill.Dec. at 566, 384 N.E.2d at 360.[40] *Ledingham* recognized just such a tort in the insurance claims context.

*Ledingham* is emphatically not "an isolated deviation from the strong current of precedents—a derelict on the waters of the law." *Lambert v. California,* 355 U.S. 225, 232, 78 S.Ct. 240, 245, 2 L.Ed.2d 228 (1957) (Frankfurter, J., dissenting). A canvass of decisions in other jurisdictions shows that the tort of bad faith claims practices has won widespread (albeit far from universal) acceptance.[41] The justification for recog-

---

to be awarded by the court; we see nothing in the statute to suggest similar limitations on the common law tort. If defendants mean to suggest that this provision supports their view that the legislature meant to take the common law "bad faith" tort away from juries and give it to judges, suffice it to say that there are potential constitutional problems with such a construction, *see, e.g., Atlas Roofing Co., Inc. v. OSHA,* 430 U.S. 442, 461 n. 16, 97 S.Ct. 1261, n. 16, 51 L.Ed.2d 464 (1977); *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), at least in federal court, where the seventh amendment applies, *see Byrd v. Blue Ridge Rural Electric Cooperative, Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

**39.** The fact that three Illinois appellate districts have recognized, in one way or another, the tort of bad faith claims handling indicates that our holding in *Kelly v. Stratton* that the supreme court would follow *Ledingham* was not a "dramatic innovation in state law." *See* discussion at p. 543 *supra.*

**40.** The court cited *Ledingham* for this proposition, a citation that may connote approval of the holding in that case. Indeed, the court in

*Lynch,* 94 Ill.App.3d at 26, 49 Ill.Dec. at 572, 418 N.E.2d at 426, so read *Kelsay.* We hesitate to rely solely upon the citation in *Kelsay,* however, because it does not necessarily indicate agreement with the "bad faith" holding in *Ledingham.*

**41.** Although not all of the jurisdictions recognizing the tort have adopted it in the same form, the following states have adopted it in one way or another: *Alabama: Chavers v. National Security Fire Ins. Co.,* 405 So.2d 1 (Ala. 1981); *Alaska: United Services Automobile Assn. v. Werley,* 526 P.2d 28 (Alaska 1974); *Arizona: Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866 (1981); *California: see generally Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 169 Cal. Rptr. 691, 620 P.2d 141 (1979); *Connecticut: Grand Sheet Metal Products Co. v. Protection Mutual Insurance Co.,* 34 Conn.Sup. 46, 375 A.2d 428 (1977); *District of Columbia: Continental Insurance Co. v. Lynham,* 293 A.2d 481 (D.C.1972); *Idaho: Linscott v. Rainier National Life Insurance Co.,* 100 Idaho 854, 606 P.2d 958 (1980); *Indiana: Craft v. Economy Fire & Casualty Co.,* 572 F.2d 565 (7th Cir.1978) (Indiana

nizing the tort is set forth in *Egan v. Mutual of Omaha Insurance Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979):

> ... the law implies in every contract a covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.
>
> \*     \*     \*     \*     \*     \*
>
> ... [an] insurer, when determining whether to settle a claim [within a third-party liability insurance policy], must give at least as much consideration to the welfare of its insured as it gives to its own interests.
>
> \*     \*     \*     \*     \*     \*

The implied covenant imposes obligations not only as to claims by a third party but also as to those by an insured. In both contexts the obligations of the insurer are merely two different aspects of the same duty. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort. For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own.

The insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the poli-

law); *Vernon Fire & Casualty Insurance Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173 (1976); *Hoosier Insurance Co. v. Mangino*, 419 N.E.2d 978 (Ind.App.1978); *Iowa: Sigler v. Mutual Benefit Life Insurance Co.*, 506 F.Supp. 542, 545 (S.D.Iowa 1980) (Iowa law), aff'd, 663 F.2d 49 (8th Cir.1981); *Amsden v. Grinnell Mutual Benefit Life Insurance Co.*, 203 N.W.2d 252 (Iowa 1972); *Mississippi: Gulf Guaranty Life Insurance Co. v. Kelley*, 389 So.2d 920 (Miss. 1980); *Montana: First Security Bank of Bozeman v. Goddard*, 593 P.2d 1040 (1979); *Nevada: United States Fidelity & Guaranty Co. v. Peterson*, 540 P.2d 1070 (Nev.1975); *New Mexico: Chavez v. Chenoweth*, 89 N.M. 423, 553 P.2d 703 (1976); *State Farm General Insurance Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974); *North Dakota: Corwin Chrysler-Plymouth, Inc. v. Westchester Fire Insurance Co.*, 279 N.W.2d 638 (N.D.1979); *Ohio: see generally Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir.1976) (Ohio law); *Sweet v. Grange Mutual Casualty Co.*, 50 Ohio App.2d 401, 364 N.E.2d 38 (1975); *Oklahoma: Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla.1978); *Rhode Island: Bibeault v. Hanover Insurance Co.*, 417 A.2d 313 (R.I. 1980); *but see Korsak v. Prudential Property & Casualty Insurance Co.*, 441 A.2d 832 (R.I.1982) (refusing to recognize tort where all of policy terms are dictated by statute); *South Carolina: Smith v. Canal Insurance Co.*, 275 S.C. 256, 269 S.E.2d 348 (1980); *Thompson v. Home Security Life Insurance Co.*, 271 S.C. 54, 244 S.E.2d 533 (1978) (breach of contract accompanied by "fraudulent act" and with "fraudulent intent"; "fraud" appears to be equivalent to "deceitful"); *Washington: Levy v. North American Co. for Life & Health Insurance*, 90 Wash.2d 846, 586 P.2d 845 (1978) (statutory good faith duty; court holds that breach is actionable under state consumer protection law); *Wisconsin: Davis v. Allstate Insurance Co.*, 101

Wis.2d 1, 303 N.W.2d 596 (1981); *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978).

Jurisdictions rejecting the "bad faith" tort include: *Florida: Shupack v. Allstate Insurance Co.*, 367 So.2d 1103 (Fla.App.1979); *Louisiana: Pete Roy Ford, Inc. v. Lachney*, 390 So.2d 248 (La.App.1980); *Bye v. American Income Life Insurance Co.*, 316 So.2d 164 (La. App.1975); *Maryland: Wiggins v. North American Equitable Life Assurance Co.*, 644 F.2d 1014 (4th Cir.1981) (Maryland law) (but noting, id. at 1018 n. 2, that Maryland law allows recovery of punitive damages "where the defendant maliciously breaches the contract"); *Michigan: Kewin v. Mass. Mutual Life Insurance Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980); *Minnesota: Wilson v. Colonial Penn Life Insurance Co.*, 454 F.Supp. 1208, 1212–13 (D.Minn. 1978) (Minnesota law); *Haagenson v. National Farmers Union Property & Casualty Co.*, 277 N.W.2d 648 (Minn.1979); *Missouri: Rossmann v. GFC Corp.*, 596 S.W.2d 469 (Mo.App.1980); *New Hampshire: Lawton v. Great Southwest Fire Insurance Co.*, 392 A.2d 576 (N.H.1978) (noting, however, the potential availability of wide-ranging consequential damages in breach of contract action); *New Jersey: see Kocse v. Liberty Mutual Insurance Co.*, 152 N.J.Super. 371, 377 A.2d 1234 (1977); *New York: Halpin v. Prudential Insurance Co.*, 48 N.Y.2d 906, 425 N.Y.S.2d 48, 401 N.E.2d 171 (1979); *Oregon: Stantilli v. State Farm Life Insurance Co.*, 278 Ore. 53, 562 P.2d 965 (1977); *Pennsylvania: see generally Mazzula v. Monarch Life Insurance Co.*, 487 F.Supp. 1299 (E.D.Pa.1980) (Penna. law) (duty of good faith exists, but only remedy for breach is contract action); *D' Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, 262 Pa.Super. 331, 396 A.2d 780 (1978).

cy—rather, he seeks protection against calamity.

\* \* \* \* \* \*

The special relationship between the insurer and the insured illustrates the public policy considerations that may support exemplary damages in cases such as this.

As one commentary has noted, "The insurers' obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements . . ." The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust. Furthermore, the relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position.

*Id.* at 818–19, 820, 169 Cal.Rptr. at 695, 696, 620 P.2d at 145, 146, (citations omitted).

*Ledingham,* like the California cases on which it relied, was based in part upon an extension to the first-party insurance context of the duty of good faith developed in third-party insurance "duty to settle" cases, *see generally Conway v. Country Casualty Insurance Co.,* 92 Ill.2d 388, 399, 65 Ill.Dec. 934, 442 N.E.2d 245 (1982). *Debolt* criticized this aspect of *Ledingham,* noting that in third-party insurance cases, the insurer has the right to complete control over the negotiation and litigation of claims against the insured, a situation that does not obtain in the first-party context, in which the in-

sured may at any time maintain an action for breach of contract. *Debolt,* 56 Ill. App.3d at 115, 13 Ill.Dec. at 660, 371 N.E.2d at 377. This distinction was rejected by our Court of Appeals construing Indiana law, in *Craft v. Economy Fire & Casualty Co.,* 572 F.2d 565 (7th Cir.1978):

> It does not necessarily follow [in the first-party insurance context] that the insurer is completely free of any obligation of good faith and fair dealing to its insured, since the latter duty is based on the reasonable expectations of the insured and the unequal bargaining positions of the contractants, rather than the insurance company's "control" of the litigation.

*Id.* at 569 (citation omitted).[42]

Illinois recognizes the "public service" nature of the insurance business, and the unequal bargaining positions of insurer and insured, by way of its statutory scheme governing insurers. For example, Ill.Rev. Stat. ch. 73, § 766.6 (1981) sets forth an extensive list of "improper claims practices" the commission of which may give rise to administrative action by the state department of insurance.[43] *See also, e.g.,* Ill.Rev. Stat. ch. 73, § 767.9 (1981) (requiring "policyholder security deposit accounts" to protect policyholders against insurer's insolvency); Ill.Rev.Stat. ch. 110, § 2–209(a)(4) (long-arm provision applying to those "contracting to insure any person, property or risk located within this State"); *id.* § 2–103(e) (action against insurer incorporated or doing business in Illinois may be brought in any county in which a plaintiff resides).

■ We think that the Illinois Supreme Court, were it faced with the issue, would follow the California line of cases and hold that an insured may maintain a cause of action in tort against an insurer that has acted in bad faith or dealt unfairly with the

---

**42.** While *Craft* concerned Indiana law, the statements made by the court go beyond mere interpretation of Indiana law and thus are relevant here.

**43.** We recognize that this list does not give rise to a private right of action for damages caused

by a listed practice, *e.g., Hamilton v. Safeway Insurance Co.,* 104 Ill.App.3d 353, 356–57, 60 Ill.Dec. 97, 100, 432 N.E.2d 996, 999 (1st Dist. 1982); that is not the issue here. Rather, we cite the statute for the proposition that the legislature regards the insurance industry as "special" and worthy of close examination.

insured.[44] It would also hold, we believe, that the existence of the limited remedy permitted by Ill.Rev.Stat. ch. 73, § 767 (1981) does not preclude or weigh against recognition of such a tort remedy.[45] Neither of these holdings works a "dramatic expansion" in state law, for, as we have noted, the Illinois courts have split both on the preclusive effect of § 767 and on the availability of a "bad faith" tort cause of action apart from any question of preemption.[46]

The contours of the "bad faith" tort may be briefly sketched out.[47] While punitive damages may be available in some cases, they clearly are not available in all cases. Under Illinois law, punitive damages may be awarded only where the defendant has acted in a fraudulent, malicious, wanton, or oppressive manner. *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 178, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978). In determining whether punitive damages are available in a given case, one must look at the defendant's motive, purpose, and state of mind. *See Allabastro v. Cummins,* 90 Ill. App.3d 394, 400, 45 Ill.Dec. 753, 757, 413 N.E.2d 86, 90 (1st Dist.1980). It may also be appropriate in certain cases to consider the relative bargaining strengths of the parties. In contrast, in order to establish liability for compensatory damages in a "bad faith" case, the standard is similar, though not identical, to that under § 767: "unreasonable" conduct, or conduct "without reasonable cause." *See Smith v. Metropolitan Life Insurance Co.,* 550 F.Supp. 896, 900 (N.D.Ill.1982). Where, for example, the insurer has denied a claim based on a good faith dispute as to coverage, the insured's bad faith claim will fail. *See, e.g., Vernon Fire & Casualty Insurance Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173, 184 (1976); *State Farm General Insurance Co. v. Clifton,* 86 N.M. 757, 527 P.2d 798 (1974). In the contrasting circumstances presented in these two cases it is inappropriate for us to say more regarding the dimensions of plaintiffs'

**44.** The fear that such a holding would eliminate the "barrier" between tort and contract and lead generally to the awarding of punitive damages in all breach of contract cases is unwarranted. Permitting an insured to maintain a cause of action in tort is justified primarily on the basis of the "public service" nature of the insurance business and the unequal bargaining relationship between insurer and insured. These circumstances do not exist in all, or even in most, contracts.

**45.** The existence of an extensive regulatory scheme does not militate against recognition of the "bad faith" tort. Nearly all of the states that have recognized the tort, *see* n. 41 *supra,* have similar regulatory schemes. The same is true of the limited remedy provided in § 767. It is important to keep in mind exactly what the legislature did and did not do in § 767. It did not provide for damages to compensate the insured for losses caused by the insurer's bad faith—for example, collateral financial results such as loss of a house protected by a credit life or disability policy. It did impose a limited penalty on offending insurers, but it did so by *relaxing the standard* for the award of such penalties. One might reasonably infer that the legislature, despite Western-Southern's protestations to the contrary, actually did intend to add on an additional penalty for such conduct, over and above common law remedies available upon a greater showing by a plaintiff. We need not address at this juncture whether a court would have to subtract from a common law punitive damages award a penalty awarded in the same case under § 767.

**46.** While one of the two cases at bar, No. 82 C 6789, was originally filed in an Illinois court within the First Appellate District, our holding that we must apply the law the state supreme court would follow controls here. We have examined the First District holdings on both the preclusion and recognition questions and have found that they omit certain "data" that the supreme court would in our view find critical. In addition, we think that we may properly consider holdings from other states concerning the "bad faith" tort. The supreme court, in *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill. Dec. 559, 384 N.E.2d 353 (1978), recently did the same in addressing the question whether to recognize a "retaliatory discharge" tort.

**47.** At least one court has held that a state "unfair trade practices" statute provides a cause of action in favor of insureds for an insurer's bad faith conduct. *See Morgan v. American Family Life Assurance Co.,* 559 F.Supp. 477 (W.D.Va.1983) (West Virginia law). Illinois has a similar statute. *See* Ill.Rev. Stat. ch. 121½, § 261–72 (1981). We express no view as to whether an Illinois plaintiff may maintain such a claim under that statute. *See generally Fox v. Industrial Casualty Insurance Co.,* 98 Ill.App.3d 543, 54 Ill.Dec. 89, 424 N.E.2d 839 (1st Dist.1981).

claims until they are developed by discovery and trial.

### III

For the reasons expressed above, the motion to dismiss No. 82 C 6789 is denied, and the motion to dismiss counts 2 and 4 of the complaint in No. 82 C 5628 is denied. Defendants are ordered to answer in 14 days. Discovery/trial scheduled heretofore established to stand.